642 A.2d 856

BOARD OF TRUSTEES OF the MARYLAND TEACHERS
& STATE EMPLOYEES SUPPLEMENTAL
RETIREMENT PLANS

v.

LIFE AND HEALTH INSURANCE
GUARANTY CORPORATION.

**No. 110, Sept. Term, 1993.**

Court of Appeals of Maryland.

June 10, 1994.

Diane Krejsa, Asst. Atty. Gen., Baltimore (J. Joseph Curran, Jr., Atty. Gen., Baltimore, John K. Barry, Asst. Atty. Gen., Annapolis, all on brief), for petitioner.

George A. Nilson (Joan E. Quigley, Piper & Marbury, all on brief), Baltimore, for respondent.

William Carlisle Herbert, Stephen L. Humphrey, William T. Casey, Hopkins & Sutter, all on brief, Washington, DC, amicus curiae, for National Ass'n of Life and Health Ins. Guar. Associations (respondent).

Kevin A. Dunne, Ober, Kaler, Grimes & Shriver, Baltimore, Larry W. Gabriel, Iain A.W. Nasatir, Pachulski, Stang, Ziehl & Young, P.C., Los Angeles, CA, all on brief, amicus curiae, for Group Annuity Participant Protection Ass'n (petitioner).

Argued before MURPHY, C.J., RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ., and

CHARLES E. ORTH, Jr.,* Judge of the Court of Appeals (retired) Specially Assigned.

RODOWSKY, Judge.

The question presented here is whether two guaranteed investment contracts (GICs) issued to the Board of Trustees of the Maryland Teachers and State Employees Supplemental Retirement Plans (the Board) by Executive Life Insurance Company (ELIC) constituted "covered policies" under the Life and Health Insurance Guaranty Corporation Act, Maryland Code (1957, 1994 Repl.Vol.), Art. 48A, §§ 520 through 537 (the Guaranty Act). The answer to the question presented turns on the construction of Art. 48A, § 65, defining "annuities" and an "annuity contract." [1]

The Board, created in 1985, is charged with "[t]he general administration and responsibility for the proper operation of" certain supplemental compensation plans for state employees and teachers, including a deferred compensation plan for state employees. Md.Code (1957, 1988 Repl.Vol., 1993 Cum.Supp.), Art. 73C, §§ 2 and 5(a). A deferred compensation plan initially had been established under an executive order in 1974, and that plan is continued by the Board. Art. 73C, § 5(b). The document that the parties have utilized in the instant litigation to evidence the terms of the plan is The Maryland State Employees Deferred Compensation Plan, as amended and restated in 1988 (the Plan). The Plan is designed to comply with § 457 of the Internal Revenue Code. Under the Internal Revenue Code income tax is deferred on the amounts consensually withheld from employees and paid into the Plan, and access by a participant to the funds in that person's Plan account is restricted.

---

* Orth, J., participated in the hearing of this case and in the conference in regard to its decision but died prior to the adoption of the opinion by the Court.

1. Unless otherwise indicated all statutory references are to Md.Code (1957, 1994 Repl.Vol.), Art. 48A.

One function of the Board is to invest the deferrals of Plan participants. Participants select the type or types of investments for their respective deferrals from a menu of investment options offered by the Board from time to time. One option has been a fixed income investment.

GICs are fixed income investments. The Board purchased two GICs from ELIC on separate occasions in 1987. The earlier purchase is Group Annuity Contract No. GA–GICO1209 and the later is Group Annuity Contract No. GA–CG012443A. The premium for the earlier policy is the deferrals for the period from January 1 through April 15, 1987, up to a maximum of $6 million in deferrals of Plan participants who selected the fixed income investment option. ELIC agreed to pay interest at the rate of 8.25%, credited and compounded daily, until the maturity of that contract on December 31, 1991, when ELIC would pay the Board "the fund value."[2] The GIC purchased later from ELIC was issued October 2, 1987, with a guaranteed interest rate of 10.05%, a premium deposit period from October 1 to December 31, 1987, a premium deposit limit of $9 million, and a maturity date of September 30, 1992. In other respects the provisions of the two GICs are substantially the same.

ELIC is a California-domiciled life insurance company that was authorized to transact annuity business in Maryland. "Since the latter part of 1989, [ELIC] began to report significant reductions in the market value of [its] investment portfolios and increased defaults of high yield securities." 1993 Best's Insurance Reports–Life/Health 884. On April 11, 1991, the California Insurance Commissioner placed ELIC in conservatorship, and on December 6, 1991, ELIC was declared insolvent. A plan of rehabilitation has been approved under which it appears that the Board will suffer a loss on its ELIC GICs.

---

2. Under the ELIC GICs "[t]he fund value equals the sum of all premium deposits, less any premium taxes paid by the Company, [and] any withdrawals ... plus interest earned at the guaranteed rate and left on deposit with the Company."

The Guaranty Act was first enacted in 1971. As amended, its purpose "is to protect residents who are policyowners, insureds, beneficiaries, annuitants, payees, and assignees of life insurance policies, health insurance policies, [and] annuity contracts ... against failure in the performance of contractual obligations due to the impairment of the insurer issuing these policies or contracts." § 521. Section 522(1) makes the Guaranty Act applicable to "direct life insurance policies, health insurance policies, annuity contracts, and contracts supplemental to ... annuity contracts issued by persons authorized to transact insurance in this State," with certain exceptions not relevant here. A policy described in § 522 is a " '[c]overed policy' " under the Guaranty Act. § 524(4).

Section 525(1) creates the Life and Health Insurance Guaranty Corporation (the Corporation) to administer the Guaranty Act. If a foreign insurer is under an order of liquidation, the Corporation shall "guarantee ... the covered policies of residents" and "[a]ssure payment of the contractual obligations of the impaired insurer to residents." § 527(4)(a). In order to raise the funds necessary to carry out its duties, the Corporation is empowered to levy assessments on insurers writing covered policies in Maryland. § 528. For purposes of administration and assessment the Corporation maintains three accounts: health, life, and annuity. § 525(1). Assessments arising from the failure of an impaired foreign insurer are made "against member insurers for each account ... in the proportion that the premium received on business in this State by each assessed member insurer on policies covered by each account bears to such premiums received on business in this State by all assessed member insurers." § 528(3)(b).

Following the order for ELIC's liquidation, the Board brought the instant action against the Corporation. The Board's complaint sought a declaratory judgment that the ELIC GICs "are annuity contracts entitled to the benefits of" the Guaranty Act and also sought certain injunctive and monetary relief. Each party moved for a summary judgment declaring, respectively, that the ELIC GICs were or were not covered policies under the Guaranty Act. In a memorandum

opinion and order the circuit court's principal conclusion was "that the ELIC GICs do not satisfy the statutory requirements for an 'annuity contract.'"

The Board appealed to the Court of Special Appeals and petitioned this Court to grant a writ of certiorari prior to review by the intermediate appellate court. We granted the writ. Before this Court the Board's position is supported by an amicus curiae brief filed by the Group Annuity Participant Protection Association (GAPPA), an unincorporated association of employment plan sponsors who have claims in the ELIC insolvency. The Corporation's position is supported by an amicus curiae brief filed by The National Organization of Life and Health Insurance Guaranty Associations (NOLHGA).

The Board contends that the GICs are covered policies because they are group annuity contracts, one of the types of policies to which the Guaranty Act applies. § 522(1). "Annuity contract" is not a term that is defined in the Guaranty Act. The term does appear, however, in § 65 which reads:

> "'Annuities' means all agreements to make periodical payments where the making or continuance of all or some of a series of such payments, or the amount of any such payment, is dependent upon the continuance of human life.... The business of annuities shall be deemed to include additional benefits operating to safeguard the contract from lapse, or to provide a special surrender value, or special benefit, or annuity, in the event of total or permanent disability of the holder. An 'annuity contract' is a contract providing for an 'annuity' as defined in this section."

The Corporation submits that the ELIC GICs contain no agreement to make periodic payments, and contain no agreement to make payments dependent upon the continuation of human life. The Board, on the other hand, submits that these GICs satisfy the § 65 definition because they are sold by an insurer to fund a pension plan (in the broad sense), contain an annuity option, and are generally recognized as group annui-

ties in the insurance industry and by the Maryland Insurance Commissioner (the Commissioner).

The first step in resolving this difference of opinion is to examine the terms of the ELIC GICs and their relationship to the Plan. For this purpose the parties have treated the two GICs as substantially the same, and utilized the text of the earlier contract. We shall do the same.

Bookkeeping and recordkeeping of participants' accounts in the Plan, service to participants, and other details of Plan administration are performed by a Plan Administrator under contract to the Board. The Plan Administrator is an affiliate of Nationwide Life Insurance Corporation (Nationwide). Prior to January 1, 1987, deferrals of Plan participants choosing a fixed income investment option were invested in a contract with Nationwide. Thereafter the Board sought to diversify investments of that type and to increase its return. We infer that under the diversification program the Board purchased a separate GIC in which to invest fixed income deferrals contributed during each three month period.

The Plan provides for "[b]enefits through payment of a PARTICIPANT'S account balance . . . upon the PARTICIPANT'S death, retirement, separation from service, the occurrence of an unforeseeable emergency causing financial hardship, or the attainment by the PARTICIPANT of age 70½, whichever shall first occur." " 'Financial Hardship' under the Plan" means "severe financial hardship to the PARTICIPANT resulting from a sudden and unexpected illness or accident of the PARTICIPANT or one or more of his dependents," and it also means "financial hardship to the PARTICIPANT caused by loss of the PARTICIPANT'S property due to casualty. . . ."

With respect to the methods of payment of benefits, the Plan provides the following:

"The methods of payment of benefits available for election by a PARTICIPANT shall be either: (A) a single sum payment of the entire value of the PARTICIPANT'S account; (B) an installment schedule of monthly, quarterly or

yearly payments of a period of one or more years; (C) a series of payments on an annuity basis as if an annuity contract was purchased for such person, with payments under this option occurring either (I) over the life of the PARTICIPANT; (II) over the life of the PARTICIPANT and his spouse; (III) over the life of the PARTICIPANT and an individual other than his spouse; (IV) over the life of the PARTICIPANT and a period certain, whichever is greater. For any PARTICIPANT who has elected any life insurance option available under the Plan, payment of benefits may be made through either distribution of cash benefits available under such policy, or, at the election of a PARTICIPANT, through distribution of a policy to such individual."

Plan participants may also change their investment options at such times as the Board is able to change its investments under the constraints of the existing investments and of the Plan Administrator's contract.

Under the subject GICs the Board, as contract owner, is in privity with ELIC. GICs in which "the insurance company has no direct contractual obligation to the [Plan] participant" are called "unallocated contracts." Forcier, *A GIC Primer: Terminology, Contract Provisions, How GICs Are Used By Plan Sponsors And Competing Products,* in Investing in GICs: Navigating The Insurance Crisis 18 (P.L.I. Edgar ed. 1991) (Forcier). The ELIC GICs accommodate the exercise, before maturity of a GIC, of the participants' transfer and withdrawal rights under their Plan accounts. Withdrawal by the Board from a GIC is permitted "to comply with participant re-allocations among other investment funds available under the plan." More important here, withdrawals by the Board from a GIC in order for the Plan to pay a participant's benefits may also be made pursuant to the following provision:

"The [Board] may direct the Company to purchase an individual annuity contract for a participant before the retirement date. The Company will withdraw the cost of annuity benefits for the participant on the date it receives the [Board's] written request. *The [Board] may also with-*

*draw all or part of that portion of the fund value allocable to a participant, in accordance with withdrawal provisions of the Plan in effect on the Date of Issue."*

(Emphasis added).

The ELIC GICs also provide that the Board "may withdraw the annuity value required to purchase an annuity for a participant who retires. The [Board] will then apply for an individual retirement annuity contract, on a form provided by the Company. The contract will be owned by the participant, and will specify the dates and amounts of payments, and all other terms and conditions of the participant's annuity."

Under such a single premium annuity issued directly by ELIC to the participant, the benefits include, as a minimum and at the participant's option, a participant's lifetime annuity, an annuity for the greater of a period certain and the participant's life, and a joint and survivor annuity. These optional individual annuities are further described as follows:

"Benefit payment amounts will be determined at the time benefits are purchased, and will be based on guaranteed tables. These tables are based on the 1971 Group Annuity Mortality Table, with 7% interest for ten years and 6% thereafter, plus an expense charge equal to the gross rate plus any premium tax payable by the Company. The Company will provide sample annuity purchase rate tables upon request."

There is also a provision that requires all withdrawals to be made on a pro rata basis. This pro rata provision prevents the Board from attempting to obtain from an ELIC GIC the total withdrawal value of a participant's account, particularly if the ELIC GIC's interest rate were below that of other unmatured GICs in which the Board had invested.

Thus, if a Plan participant dies, retires, or suffers severe financial hardship due to illness, ELIC could be called upon under its unmatured GICs to pay to the Board, in cash, ELIC's pro rata share of that participant's account in the Plan. Further, if the participant retires, becomes seriously ill,

or dies, and the participant or the participant's beneficiary elects an annuity, the Board could direct ELIC to issue that annuity upon payment of the appropriate premium and ELIC would be contractually obligated to comply.

The record does not reflect the actual withdrawals for Plan participants under the ELIC GICs. Nevertheless, the inference is compelling that, between contract inception and the conservatorship, withdrawals were made from ELIC GICs of each GIC's pro rata share of the Plan accounts of dead, retired, or financially stricken participants. The record, however, is clear that no individual annuity policy was ever issued by ELIC directly to, or for the account of, any Plan participant. All of the individual annuities purchased by the Board under the Plan had been obtained from Nationwide. It was not until 1987 that the Board, in contemplation of a competitive bidding process for individual annuities, provided in its contract with the Plan Administrator that the Board could purchase individual annuities from insurers other than Nationwide. The competitive bidding process was not administratively in place until approximately the middle of 1992.

■ The Corporation contends that "[t]he limited withdrawal provisions in the ELIC GICs" are not "life-contingent." Brief of Appellee at 15. We disagree. ELIC could be called upon, whenever a participant died, to pay its pro rata share of that participant's account in the Plan. This amount would be the initial value of the share together with interest at the guaranteed rate, compounded daily. The actual return which ELIC might have realized on its investment of the premium deposits (*i.e.,* deferrals), as of the times of demands for payments generated by death or illness of participants, could have been below the amount which ELIC had promised to pay to the Board. Thus, ELIC's assumption of the economic risk was life-contingent. Indeed, ELIC's contractual assumption also included the risk, however remote, that a catastrophe or epidemic would result in the deaths of large numbers of participants in a relatively brief span of time.

■ Thus, the principal issue in this case reduces itself to whether the periodic payment element of the § 65 definition of an annuity, which is incorporated into the definition of "annuity contract," can be satisfied by the provisions in the GICs for the issuance of individual annuity policies at the option of the Board.

## I

Under the literal language of § 65, the GICs are contracts "providing for" an annuity, because the GICs provide for options to obtain individual policies specifying life-contingent periodic payments. For example, a lease of space in an office building or in a shopping center that grants the tenant an option to expand into additional areas may be described as a lease "providing for" expansion. Similarly, a lease of a chattel with an option to purchase, either during or at the end of the term, may be considered as "providing for" purchase. Indeed, the chairperson of the Corporation acknowledged on deposition that an individual, deferred annuity policy which provides either for the lump sum withdrawal of the cash value at maturity or for the payment of a stream of periodic payments is no less an annuity if the insured should elect payment of the cash value at maturity.

The compatibility of the ELIC GICs with one connotation of the words used in the "annuity contract" definition simply clears the textual hurdle, but it is hardly conclusive where, as here, the concepts are so general. When, however, we examine Maryland's legislative and administrative responses to the evolution of life insurance products in the funding of pensions, it becomes clear that the ELIC GICs are annuity contracts within the intent of § 65.

Section 65 was enacted by Chapter 18 of the Acts of 1956 and codified as Md.Code (1951, 1956 Cum.Supp.), Art. 48A, § 149A(b). That same enactment provided definitions for "Life Insurance," "Accident and Sickness Insurance," and for various aspects of the term "premium." When the insurance industry began offering variable annuity contracts, the Attor-

ney General of Maryland, reversing an opinion reported at 44 Op.Att'y Gen. 203 (1959), ruled in 1960 that "the definition [of 'annuities'] in our Maryland law is sufficiently broad and expanding to accommodate this newly created commodity." 45 Op.Att'y Gen. 120, 123 (1960). The 1960 opinion pointed out that the definition of "annuities" in the Insurance Code "does not require that the payments be made of a certain or fixed amount." *Id.* at 122. The 1956 definitions of "annuity" and "annuity contract" were utilized in the general revision of the insurance laws by Chapter 553 of the Acts of 1963, where they appear under the subtitle, "Kinds of insurance; limits of risk; reinsurance." That 1956 definition is presently § 65. Thus, under the Attorney General's opinion, the current definition is not frozen in time to the types of contracts known in the industry when the statute was enacted in 1956.[3]

The evolution of forms of insurance for retirement purposes is traced by K. Walker in *Guaranteed Investment Contracts: Risk Analysis and Portfolio Strategies* (K. Walker 2d ed. 1992) (Walker).[4] Walker states:

"As pension coverage grew, the inefficiencies and disadvantages associated with [level premium or single premium deferred annuity] individual policies required the development of a more cost-efficient investment contract. An

---

**3.** The Attorney General's opinion reported at 45 Op. Att'y Gen. 120 was not enthusiastically embraced by the then Insurance Commissioner of Maryland. By Chapter 652 of the Acts of 1961, a moratorium until May 31, 1962 on writing variable annuities in Maryland was effected by inserting in the definition after the words, "agreements to make periodical payments," the words, "of fixed sums." That moratorium was extended to May 31, 1963 by Chapter 75 of the Acts of 1963 which for one year prohibited issuance in Maryland of contracts on a variable basis. The general revision of the Insurance Code by Chapter 553 of the Acts of 1963 allowed the prohibition against contracts on a variable basis to expire, but reserved section number 362 in Art. 48A for a future statute dealing directly with variable annuities. Section 362 was enacted by Chapter 427 of the Acts of 1970. It gives the Insurance Commissioner special regulatory powers over "individual and group variable life insurance and annuity contracts."

**4.** Kenneth L. Walker is president of T. Rowe Price Guaranteed Asset Advisors, Inc.

improvement occurred when the group annuity contract entered the market place."

*Id.* at 7.

During the mid–1950s the deposit administration contract (DAC) was developed. It "revolutionized the pension industry" and provided "major improvements over the individual annuity policy." *Id.* at 8. Under a DAC

"[a]ll funds were pooled on an unallocated basis within the general account of the insurer until such time as the participant retired. At retirement, funds were withdrawn to purchase an individual annuity policy for the participant, withdrawing the fully funded pension liability from the plan."

*Id.*

A question involving the premium tax arose from the writing of DACs in Maryland by the Equitable Life Assurance Society and generated an opinion by the Attorney General. 50 Op.Att'y Gen. 235 (1965). The Attorney General described Equitable's DAC as "a form of group annuity contract" and "typical." *Id.* at 235. Under Equitable's system the considerations were accumulated, unallocated, and applied to the purchase of individual retirement annuities if the employee's contributions had not been refunded. Contributions could be refunded because the employee had "become ineligible to continue in the program or elect[ed] to withdraw before his retirement date." *Id.* The Attorney General ruled that the group policy was an annuity contract, one of the types of policies included under the premium tax definition of "policy." Consequently, the premium tax was to be paid when the DAC was executed, contrary to Equitable's contention that there was no tax due until an individual annuity policy was issued.[5]

One may infer that Equitable's group annuity-DAC did not state the amount of the periodic payments to be made to the participant, but that that specification was to be set forth in

---

5. By Chapter 662 of the Acts of 1966 the premium tax was eliminated, over a period of two years, on "annuity contracts."

the individual annuity, when issued. In any event, inasmuch as "annuities" and "annuity contract" were then, as they are now, terms defined only in § 65, the Attorney General's 1965 opinion necessarily considered DACs to be within the § 65 definition.

Walker dates in the 1960s the next phase of the life insurance industry's quest for market share in the pension marketplace. Walker, *supra*, at 9. To meet the challenge from banks, the DAC "was vastly improved with the introduction of the immediate participation guarantee (IPG)." *Id.* "In essence, the IPG provided what its name implied: an immediate participation in the earnings, expenses, and mortality." *Id.* at 9–10. "Most IPG investment contracts issued by insurance companies contained options that permitted amounts to be withdrawn ... for the purchase of annuities, for the direct payment of benefits, or for employee-directed investment changes." *Id.* at 10.

Then, according to Walker's review of the metamorphosis, in the mid–1970s "aggressive competition from banks and mutual funds[,] ... the stellar performance of the equity markets[,] ... [t]he explosive growth of defined contribution plans, and the beginnings of volatile interest rates" caused the insurance industry to respond with "the guaranteed investment contract (GIC)." *Id.* at 13.

Forcier gives the following description of the product:

"The GIC was the first insurance industry product for the large plan market that actually promised to pay a market rate determined at the time of issuance. In that context, the use of the term 'guaranteed' is defensible: For the first time a large plan product was actually 'guaranteeing' interest at a market rate; that is, the insurance company was 'promising' (or 'guaranteeing') to pay market rates. A number of early GICs were actually called 'Guaranteed Interest Contracts.'

"Over time, the term 'Guaranteed Investment Contracts' became the more commonly used term. But even this development is understandable because professional manag-

ers tend to view accrued interest as becoming part of the principal. The insurance company was 'promising' (*i.e.*, 'guaranteeing') to pay both market rate interest and principal."

Forcier, *supra,* at 16–17.

Walker advises that "[a]s the product matured and as more insurers entered the market place, the GIC became a generic term. Today there are many different types of GICs...." Walker, *supra,* at 13.

Before any DACs, IPGs, or GICs could be delivered in Maryland, the approval of the Commissioner was required. *See* § 375(a) ("No life ... or annuity contract form ... shall be delivered, or issued for delivery in this State, unless the form has been filed with and approved by the Commissioner."). The GICs involved here are ELIC's form No. 643–11/85, which was approved by the Commissioner on March 17, 1986. The record in this case does not reflect whether, and if so, when, a GIC similar to the ELIC GIC might earlier have been approved in Maryland.

▮ Policy approval, of course, is not conclusive of statutory conformity. It is clear that previously approved policies offered by admitted companies for delivery in Maryland may fail to comply with the Insurance Code or other applicable statutes. *See, e.g., Van Horn v. Atlantic Mutual Ins. Co.,* 334 Md. 669, 686, 641 A.2d 195, 203 (1994) ("Attempts by insurance companies, purporting to exercise contract rights, to avoid the public policy of compulsory motor vehicle insurance with mandated coverages, have repeatedly been rejected by this Court."). Nevertheless, on the issue of whether a given policy complies with the Insurance Code, the determination of the Commissioner initially to approve the policy form, coupled with the absence of any exercise by the Commissioner of the § 375(b) power to withdraw approval, is entitled to weight in

construing the statute that the policy form allegedly violates.[6] *See Hammon v. Farmers Ins. Co. of Idaho,* 109 Idaho 286, 707 P.2d 397 (1985); *Department of Ins. of Indiana v. Church Members Relief Ass'n,* 217 Ind. 58, 26 N.E.2d 51 (1940); *Drogula v. Federal Life Ins. Co.,* 248 Mich. 645, 227 N.W. 692 (1929); *Clark v. Federal Life Ins. Co.,* 193 N.C. 166, 136 S.E. 291 (1927); *Colangelo v. Bankers & Shippers Ins. Co.,* 185 N.J.Super. 205, 447 A.2d 1356 (1982); *Mutual Benefit Life Ins. Co. v. Welch,* 71 Okla. 59, 175 P. 45 (1918); *Manhattan Life Ins. Co. v. Wilson Motor Co.,* 75 S.W.2d 721 (Tex.Civ. App.1934).

The Commissioner was, and is, also charged with the duty annually to "value, or cause to be valued, the reserve liabilities (hereinafter called reserves or net value) for all outstanding life insurance policies and annuity ... contracts of every life insurer doing business in this State...." Md.Code (1979 Repl.Vol.), § 83(1). In 1979, an actuarial committee of the American Council of Life Insurance proposed modifying the standard valuation law by a new approach to the "prescription of the statutory maximum valuation interest rates." Letter from Yuan Chang, Vice President, Travelers Insurance Company, to the members of the Society of Actuaries (Oct. 19, 1979), Attachment E–1 to the report on amendments to the Standard Valuation Law and to the Standard Nonforfeiture Law, by the NAIC Technical Task Force on Valuation and Nonforfeiture Value Regulation, 1980–I NAIC Proc. 515, 571. The amendments were proposed, at least in part, because

"new product development in the pension field created certain unique problems. Large fund deposits with interest guarantees at 8% (how sweet it was!) were being valued at 3½%. The surplus drain threatened an early demise of these products. This problem was particularly acute in New York."

---

**6.** Section 375(b) provides in relevant part that "[t]he Commissioner may at any time, after notice and for cause shown, withdraw any ... approval" of a policy form.

*Id.*[7]

The NAIC approved the proposed revisions to the Standard Valuation Law and to the Standard Nonforfeiture Law for Life Insurance in 1980. *See* 1981–I NAIC Proc. 765–82.

A bill patterned on the 1980 NAIC model statute was presented in 1982 to the General Assembly and supported by the Department of Licensing and Regulation, then the parent agency of the Insurance Division.[8] The Department of Legislative Services bill file reflects that the proposed legislation was accompanied by a memorandum to the Commissioner from Sidney A. Green (Green), Chief of the Life and Health Section of the Insurance Division, which stated:

"The bill has two primary objectives:

"1. To permit insurers to offer life insurance at lower premiums when interest rates are high. . . .

"2. To permit insurers greater flexibility in designing new forms of policies."

To achieve greater flexibility, the bill permitted the Commissioner to promulgate new mortality tables by regulation, revised methods of valuation to accommodate changes in interest rates, and, "when new types of insurance contracts are introduced," authorized the Commissioner to "adopt rules for re-

---

**7.** The New York Insurance Code contained a definition of annuities which is quite similar to § 65 of the Maryland Insurance Code. N.Y. Ins. Law, § 1113(a) (McKinney 1985) provided in relevant part:

"The kinds of insurance which may be authorized in this state, subject to other provisions of this chapter and their scope, are set forth in the following paragraphs.

. . . .

"(2) 'Annuities,' means all agreements to make periodical payments where the making or continuance of all or some of a series of such payments, or the amount of any such payment, depends upon the continuance of human life. . . ."

New York's definition of "annuities" was amended by L.1985, c. 864, § 1 to include "for a period certain or" following "periodical payments." *See* § 1113(a) (McKinney 1994 Cum.Supp.).

**8.** By Chapter 538 of the Acts of 1993 the Insurance Division was made an independent agency and its name changed to the Maryland Insurance Administration.

serves and nonforfeiture values based on model NAIC regulations."

The bill was enacted by Chapter 569 of the Acts of 1981 which, with immaterial subsequent amendments, is now § 83. New § 83 expressly recognized, by providing for their valuation, that GICs were being written by life insurance companies doing business in Maryland. The statute, in § 83(3)(a–3)(2)(i) through (v), sets forth formulae to be used for valuing types of life and annuity policies and designates the particular formula to be used "[f]or ... guaranteed interest contracts with cash settlement options, valued on an issue year basis ... with guaranteed durations in excess of ten years ... and guaranteed interest contracts with guaranteed duration of 10 years or less," (iii), "for guaranteed interest contracts with no cash settlement options," (iv), and "[f]or ... guaranteed interest contracts with cash settlement options, valued on a change in fund basis," (v). The formulae are the methods of calculating "the calendar year statutory valuation interest rates." § 83(3)(a–3)(2). Those formulae involve two variables, the reference interest rate and the weighting factor. The weighting factors for various types of "guaranteed interest contracts" are set forth in § 83(3)(a–3)(3)(iii)1, 2, 3 and 4. The reference interest rate for various "guaranteed interest contracts" are set forth in § 83(3)(a–3)(4)(ii), (iii), (iv), (v) and (vi).

As we have seen, GICs were originally called Guaranteed Interest Contracts. *See* Forcier, *supra*, at 16–17. *See also* Walker, *supra*, at 21 ("The term *GIC* ... sometimes is also referred to as a ... Guaranteed Interest Contract ..."). In a November 1985 article on GICs in an insurance industry magazine, the authors parenthetically define "GICs" as "guaranteed interest contracts." D. Close & H. Kayton, *GICs: The Final Hurdle*, 86 Best's Rev.–Life/Health Ins. Ed. 16, 16 (Nov. 1985) (*The Final Hurdle* ).

In June 1986 the Commissioner proposed, and in February 1987 the Commissioner adopted, a regulation defining group annuity contracts. *See* 13:13 Md.R. 1511–12 (June 20, 1986); 14.4 Md.R. 417 (Feb. 13, 1987); Md.Regs.Code (COMAR) tit.

09, §§ 30.71.01 through .07. The ELIC GICs are group annuity contracts under the regulation because they are contracts *"[p]urporting* to provide annuity benefits to more than one individual," .04A (emphasis added), issued to "[a]n employer," .04B(1), "for the purpose of providing annuity benefits to ... employees ... who agree to contribute to the cost of the annuity," .04C(2). Green drafted the regulation. His affidavit in the instant action reveals that the Insurance Division's interpretation of the Insurance Code, as reflected in the regulation, underlay the earlier approval of the ELIC GIC policy form.

■ The Commissioner's interpretative rule, formally adopted after opportunity for public comment, should also be given weight in the construction of § 65, particularly because this COMAR regulation has been extant since February 1987, and because the subject matter of GICs as group annuities has been brought to the attention of the General Assembly following promulgation of the regulation. *See Maryland Classified Employees Ass'n v. Schaefer,* 325 Md. 19, 30–34, 599 A.2d 91, 98 (1991) ("[L]egislative acquiescence in a long-standing administrative construction gives rise to a strong presumption that the interpretation is correct." (Interior quotation marks omitted)). The General Assembly's attention was directed to the subject of GICs in the following manner.

The NAIC had become involved again with GICs while considering amendment of the Life and Health Insurance Guaranty Association Model Act (the Model Act). At the request of the NAIC, the Illinois Department of Insurance had conducted a survey of 1984 written premiums that showed $46 billion of premiums, nationwide, available for assessment in the annuity accounts of guaranty associations. Half of those written premiums represented unallocated annuities. *The Final Hurdle, supra,* at 18. A Guaranty Fund Task Force, created by the NAIC, debated whether the lack of a direct contractual relationship under a GIC between the insurer and the participant was significant, or whether the retirement benefit expectations of GIC participants were no differ-

ent from the benefit expectations under any other annuity contracts. *Id.*

The matter was resolved by expressly recognizing "unallocated annuity contracts issued by member insurers" as covered in the Model Act promulgated in 1985, but that act also limited to $100,000 the guarantee on the present value of annuity benefits with respect to any one life. 1985 Model Act §§ 3(b)(1) and (c)(2)(A)(iii). The 1987 Model Act continued to provide coverage "for unallocated annuity contracts issued by member insurers." 1987 Model Act § 3(b)(1). In addition, it specifically provided that "[a]nnuity contracts ... include ... guaranteed investment contracts...." *Id.* That model also continued the $100,000 per life limit on the guarantee of the present value of annuity benefits.

The concerns reflected in the NAIC debate were expressed to the Maryland General Assembly in the form of proposed changes to the Guaranty Act. Senate Bill 126 of the 1987 legislative session would have substantially amended the Guaranty Act. One feature of the bill listed specific coverages to which the Guaranty Act would not apply, including "unallocated annuity contract benefits" and "guaranteed investment accounts." The bill failed.

In the 1988 session, Senate Bill 180 likewise proposed substantial changes to the Guaranty Act. Those changes included a list of types of policies excluded from the Guaranty Act's coverage, among which were "unallocated annuity contract benefits," "deposit administration contracts," and "guaranteed investment of [sic] contract accounts." Senate Bill 180 also failed.

Proposals to limit the exposure of the Corporation reappeared before the General Assembly in the 1990s. House Bill 70 of the 1991 session would have excluded "guaranteed investment contract accounts" from guaranty fund coverage, and would have imposed a $100,000 limit on annuity benefits that were covered. House Bill 70 failed. House Bill 287 of the 1992 session contained the same features as those in the prior year's bill, previously described. House Bill 287 failed.

We have said that " 'the fact that a bill on a specific subject fails of passage in the General Assembly is a rather weak reed upon which to lean in ascertaining legislative intent.' " *T.H.E. Ins. Co. v. P.T.P. Inc.,* 331 Md. 406, 422, 628 A.2d 223, 231 (1993) (quoting *Automobile Trade Ass'n v. Insurance Comm'r,* 292 Md. 15, 24, 437 A.2d 199, 203 (1981)). Here, however, the failed amendments do not stand in a vacuum. The fact that GICs were being written by life companies doing business in Maryland had been recognized by the General Assembly in the Standard Valuation Act of 1982. The Commissioner's interpretation of "annuity contract" in § 65 had been formally promulgated as a regulation in 1987. The bills that failed in 1987, 1988, 1991, and 1992 further evidence the General Assembly's awareness that the Commissioner's administrative practice and later, formal interpretation included GICs in "annuity contracts" under § 65. That combination of factors makes the administrative interpretation persuasive in this case.

Nothing in the scant body of national case law, dealing specifically with GICs and guaranty funds, alters the conclusion that we have reached under principles of Maryland law. A somewhat analogous question was presented in *Minnesota Life & Health Ins. Guar. Ass'n v. Department of Commerce,* 400 N.W.2d 769 (Minn.Ct.App.1987). Following the failure of an insurer from which Minnesota residents had purchased over 2,700 single premium deferred annuities, the guaranty association levied an assessment that excluded unallocated annuity contracts, including GICs and DACs. The guaranty association based this distinction on its interpretation of the Minnesota guaranty act which defined "annuity contracts" to mean " 'contracts ... wherein the policyowner agrees to make payments to the insurer at the beginning of the contract period and the insurer agrees to make payments thereafter to the insured for a specified period of time or until the insured's death.' " *Id.* at 771. Insurers that had been assessed, but which did not write GICs and DACs, appealed to the Commissioner of Commerce who ordered the assessment enlarged to include premiums on GICs and DACs. In an administrative

appeal, the court affirmed. It held that the testimony of witnesses at the agency hearing to the effect that GICs and DACs would be considered annuity contracts under the definition supported the agency decision. Among various rules of statutory construction relied on by the court was that which gives "great weight to a construction placed upon [the statute] by the department charged with its administration." *Id.* at 774 (interior quotation marks omitted).

More relevant to the instant matter is that the Minnesota guaranty act also covered contracts "supplemental to" annuity contracts, that the Commissioner of Commerce alternatively held that GICs and DACs were contracts "supplemental to" annuity contracts, and that the Minnesota court rejected that alternative holding. The court said that

"GICs and DACs are not 'supplemental to' anything. Evidence at the hearing shows the annuity option contained in such contracts is one possibility of the GIC or DAC. For example, if the pension fund trustee decided to exercise an annuity option contained in a DAC or GIC, the trustee would then enter into a supplemental contract. However, since there is sufficient evidence to uphold the Commissioner's decision based on direct coverage of DACs and GICs as annuity contracts, we will not address this question in detail."

*Id.* Thus, the GIC itself, containing the option for an individual annuity, was an annuity contract, without exercise of the option to obtain the individual annuity contract.

 At oral argument in this Court, the Corporation took the position that the ELIC GICs properly are classified under the Maryland Insurance Code as funding agreements under § 416B. Section 416B(a)(3) defines a " '[f]unding agreement' " to mean "any agreement described by this section." The definition is, therefore, functional. It would unduly lengthen this opinion to reproduce the nearly two pages of the statute. Sufficient for present purposes is that a funding agreement is not an annuity contract under the Insurance Code. Section 416B(a)(2) provides that "[t]he issuance or delivery of a fund-

ing agreement is not a business authorized under §§ 62 through 74 of [the Insurance Code], but does constitute an insurance business." Further, "[a] funding agreement may not provide for payment to, or by, the insurer based on mortality or morbidity contingency." § 416B(c)(2). The payment referred to is not limited to periodic payments. Thus, the lump sum payment option on death, or on hardship due to illness, under the ELIC GICs precludes those contracts from being funding agreements, even before it is necessary to consider the effect under § 416B(c)(2) of the option for periodic life-contingent payments.

Moreover, the funding agreement statute was not enacted until 1987, by Chapter 565 of the Acts of that year. If the Corporation is correct in arguing that the ELIC GICs are funding agreements, and not § 65 annuity contracts, then the life insurance industry erred prior to 1987 by offering GICs in Maryland, the Commissioner erred by approving GIC policy forms, and the Insurance Division examiners erred by valuing policies that should never have been issued. But it was not the legislative intent in enacting § 416B to alter the existing rules, either prospectively or retrospectively. Rather, the purpose was to enlarge the class of authorized insurance products. A staff memorandum to the Committee on Economic Matters on House Bill 1347, which became § 416B, noted that "[t]he bill specifically excludes payments made based on mortality or morbidity, *which are already authorized under current law.*" (Emphasis added). The Legislature did not intend to repeal by implication the authorization of mortality-contingent payments that had previously been recognized as annuities under the Insurance Code.[9]

Finally, if the Corporation is correct in arguing that an annuity contract must itself contain a promise, made directly to the payee, to make the life-contingent periodic payments,

---

9. The Department of Legislative Services bill file illustrates possible uses of the funding agreement statute as including the payment of a structured settlement in a tort case and investments by pension funds in contracts that have no life or health contingency payment features.

then the concept of group annuities might be jeopardized. It may well be that the restricted application of the terms of § 65, for which the Corporation contends, can be satisfied only by an individual policy. That result should be avoided in view of the express legislative recognition of group annuities in §§ 83, 375, and in the Standard Nonforfeiture Act, § 408, as well as in the Commissioner's interpretative regulation.

## II

In granting summary judgment in favor of the Corporation, the circuit court wove an additional consideration into its construction of § 65 as excluding the ELIC GICs. That court said that "[t]he summary judgment record establishes as a matter of law that the sketchy annuity provisions of the ELIC GICs are appendages having no real or substantial relation to the core undertakings, enforceable or not, of the contracting parties." Returning to the same theme, the circuit court further wrote:

"The record here establishes as a matter of law that there was no genuine purpose on the part of the Board or ELIC to provide annuity benefits to participants through the ELIC GICs. The Board's essential and fundamental purpose was to maximize its fixed investment income; no doubt, ELIC likewise intended merely to increase its profits and its profitability."

That analysis, jurisprudentially, is inconsistent with the objective theory of contracts. Our conclusion may be demonstrated by a hypothetical. We begin with ELIC's promise in writing to issue individual annuities to Plan participants at retirement "with 7% interest for ten years and 6% interest thereafter...." Next, assume that the Board had shaken the shackles of its arrangement with Nationwide, and that economic conditions made ELIC's promise advantageous at some time prior to the maturity of an ELIC GIC, so that all Plan retirees selected an annuity option. Further, assume that the Board tendered all of the retirees' accumulated savings in their respective Plan accounts to ELIC and demanded that

the annuities respectively elected be issued to the retirees. Clearly, it would be no defense for ELIC to prove that neither it, nor the Board, anticipated when the GIC was issued that the annuity option would ever be exercised. The annuity option is a provision of the GIC. Whether the option is exercised, or anticipated to be exercised, is immaterial to the validity of the GIC and to its compliance with § 65.

Further, from the standpoint of administration by the Commissioner of § 375, relating to the approval of individual and group life, health and annuity policies, the rationale of the circuit court is so impractical that the Legislature could not have intended it to be the test for an annuity contract under § 65. At the time of policy review, the Commissioner's concern is with the form. At that time there is no requirement for specifically identified insureds, or policyowners, or group participants. Whether the annuity option in a given GIC form will or will not be exercised in fact by any pension plan policyowner on behalf of any plan participants, after issuance as a policy, cannot be determined when the form is submitted to the Commissioner for approval. A determination of a GIC's annuity contract status, under § 65, cannot be based on meeting some judicially set degree of probability that the option will be exercised.

For the reasons set forth in Parts I and II, we hold that the circuit court erred in granting summary judgment in favor of the Corporation, and that judgment will be reversed.

## III

The Corporation also argues that "[a]t best, the Board's option to withdraw funds to purchase an individual retirement annuity is nothing more than an unenforceable 'agreement to agree' at some point in the future about the terms of such an annuity." Brief of Appellee at 31. It is said that the ELIC GICs leave to future negotiations the specific terms of a specific annuity. The circuit court did not decide whether this argument had any merit and did not rest its grant of summary judgment on this ground. Where, as here,

the basis for granting summary judgment is erroneous, " 'the appellate court will not ordinarily undertake to sustain the judgment by ruling on another ground, not ruled upon by the trial court, if the alternative ground is one as to which the trial court had a discretion to deny summary judgment.' " *Three Garden Village Ltd. Partnership v. United States Fidelity & Guar. Co.*, 318 Md. 98, 107–08, 567 A.2d 85, 89 (1989) (quoting *Geisz v. Greater Baltimore Medical Center*, 313 Md. 301, 314 n. 5, 545 A.2d 658, 664 n. 5 (1988)).

It is inappropriate for this Court, on this record, to treat the Corporation's contention as a matter of law and to rule thereon. The record does not reflect whether ELIC had obtained approval in Maryland for one or more individual annuity contracts that would comply with the description in the ELIC GICs. The availability of one or more approved individual policies may well completely undercut the Corporation's argument.

The principle invoked by the Corporation was stated in *Robinson v. Gardiner*, 196 Md. 213, 217, 76 A.2d 354, 356 (1950), where we said:

"[N]o action will lie upon a contract, whether written or verbal, where such a contract is vague or uncertain in its essential terms. The parties must express themselves in such terms that it can be ascertained to a reasonable degree of certainty what they mean. If the agreement be so vague and indefinite that it is not possible to collect from it the intention of the parties, it is void because neither the court nor jury could make a contract for the parties."

It was recently applied in *Horsey v. Horsey*, 329 Md. 392, 418–22, 620 A.2d 305, 318–20 (1993).

We are not prepared to say that a court, with appropriate assistance by expert testimony, could not determine the *essential* terms of an individual annuity for a specifically identified Plan retiree, utilizing the GICs, their incorporated mortality table, the stated interest rates, and general industry practice. Accordingly, we reject, without prejudice, the Corporation's indefiniteness argument.

The Board, on its appeal from the final judgment entered in favor of the Corporation, has claimed that the circuit court erred in denying the Board's motion for summary judgment. For the reasons stated in this Part III, we also decline, without prejudice, to mandate summary judgment in favor of the Board on its claim for a declaration that the ELIC GICs are covered policies under the Guaranty Act.

## IV

The premise of all of the arguments that we have considered to this point has been that the inclusion of "annuity contracts" in § 522(1) of the Guaranty Act, where the quoted term is not specially defined, meant that the term was to be construed in § 522(1) as it is construed in § 65 and elsewhere in the Insurance Code. We now consider an argument advanced by the Corporation that denies that premise. The Corporation urges us, on policy grounds, to exclude unallocated annuities from the Guaranty Act alone.

The Corporation points out that approximately fifteen states deny any guaranty fund coverage to unallocated annuity contracts,[10] and that, although approximately twenty states extend protection to unallocated annuity contracts,[11] those states impose specific monetary limitations on the liability of the guaranty association. The Corporation submits that the proper role of the Guaranty Act is the protection of unsophisticated, individual policyholders, whereas unallocated annuities typically are purchased by pension plans that are managed by sophisticated trustees who are assisted by professional financial consultants. The Corporation predicts that, if this Court concludes that unallocated annuities are covered policies, Maryland will become the state of choice for the formation of

---

**10.** *See* Brief of Amicus GAPPA at 8 n. 10; Brief of Amicus NOLHGA at 4 n. 1.

**11.** *See* Brief of Amicus NOLHGA at 4 n. 1; Brief of Amicus GAPPA at 8 & n. 9.

recklessly managed pension plans.[12] These arguments are appropriately directed to the General Assembly. Indeed, they may well have been so directed when limiting amendments to the coverage of the Guaranty Act were offered in past sessions, as reviewed above.

This public policy argument by the Corporation was not a ground on which summary judgment was granted by the circuit court. The argument, however, presents a pure question of law that does not involve any trial court discretion. Basically the Corporation asks us to construe "annuity contract" more restrictively in the Guaranty Act than "annuity contract" is construed elsewhere in the Insurance Code. A restrictive construction limited to the Guaranty Act would violate the mandate of § 523 of the Guaranty Act under which that "subtitle shall be liberally construed to effect the purpose under § 521 . . . ." That purpose "is to protect residents who are policyowners, insureds, beneficiaries, annuitants, [and] payees . . . of life insurance policies, health insurance policies [and] annuity contracts . . . ." For that reason we reject the Corporation's public policy argument.

*JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY VACATED. CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY THE APPELLEE, LIFE AND HEALTH INSURANCE GUARANTY CORPORATION.*

---

12. In addition to minimizing the effect of federal control on pension plans and minimizing state control over, and examination of, insurers writing GICs, this argument assumes how the term "resident," as used in the Guaranty Act, is to be construed. We intimate no opinion on that question of construction.