UNISYS CORPORATION, APPELLEE AND CROSS-APPELLANT, V.
NEBRASKA LIFE AND HEALTH INSURANCE GUARANTY
ASSOCIATION, AN UNINCORPORATED ASSOCIATION,
APPELLANT AND CROSS-APPELLEE.

673 N.W.2d 15

Filed January 2, 2004.   No. S-02-1056.

Shawn D. Renner and Pamela Epp Olsen, of Cline, Williams, Wright, Johnson & Oldfather, P.C., for appellant.

Jefferson Downing and Gary L. Young, of Keating, O'Gara, Davis & Nedved, P.C., and Joann Hyle, of Pepper Hamilton L.L.P., for appellee.

CONNOLLY, GERRARD, STEPHAN, MCCORMACK, and MILLER-LERMAN, JJ.

STEPHAN, J.
The Nebraska Life and Health Insurance Guaranty Association (Association) appeals from an order of the district court for Lancaster County denying its motion for summary judgment and granting the cross-motion for summary judgment filed by Unisys Corporation. The district court held that certain Unisys employees were entitled to coverage under the Nebraska Life and Health Insurance Guaranty Association Act (Act), Neb. Rev. Stat. §§ 44-2701 to 44-2720 (Reissue 1998), after the insolvency of an insurance company which had issued certain contracts to Unisys retirement plans in which the employees had invested. Specifically, the court held that the contracts at issue

were "annuity contracts" under Nebraska law and that the employees were the equitable or beneficial owners of the contracts. The Association contends in this appeal that both determinations were erroneous.

## FACTS

The Association is an unincorporated association of insurers created by statute to protect certain Nebraska residents against failure in the performance of contractual obligations of certain impaired or insolvent insurers. See § 44-2701. Unisys is a Delaware corporation with an office in Pennsylvania. Unisys established and is the named fiduciary and plan administrator of the Unisys Savings Plan and the Unisys Retirement Investment Plan (collectively the Plans). The Plans are designed to encourage savings and provide retirement and other benefits to Unisys employees. In furtherance of this purpose, the Plans permit eligible Unisys employees to defer and invest a portion of their compensation in the Plans. Investments made by each participating employee are held in a separate account. The Plans permit withdrawals from employee accounts in the event of the employee's retirement, death, voluntary or involuntary termination of employment, or inservice withdrawals.

In accordance with the terms of the Plans, a trust was established to hold the Plans' assets. Northern Trust Company, an Illinois bank, was the trustee in 1987 and 1988 when the contracts at issue in this case were purchased. Northern Trust was succeeded as trustee by Mellon Bank, a resident of Pennsylvania, which was succeeded as trustee by CoreStates, another Pennsylvania bank. The current trustee is First Union Bank, a bank with its principal place of business in North Carolina.

The Plans identified several investment options from which each participating employee could elect to have current contributions invested, including a "Fixed Income Fund" and an "Insurance Contract Fund." Portions of these two funds were invested in four contracts issued by Executive Life Insurance Company (Executive Life), an insurance company organized under the laws of California and licensed to transact business in Nebraska. Each contract designated the Plans' trustee as the owner of the contract. Two of the contracts defined the term

"participant" as "[a]n individual on whose behalf the Trustee will purchase retirement benefits," and the remaining two contracts defined the term as "[a]n individual on whose behalf the [Trustee] will purchase or provide retirement benefits."

In accordance with the Plans' provisions, all four Executive Life contracts permitted the trustee to deposit a premium which would earn interest at a guaranteed rate over a fixed term. Each contract provided that the trustee "may direct [Executive Life] to purchase an individual annuity contract for a participant before the retirement date." The contracts each included an additional provision which permitted the trustee to

> withdraw the annuity value required to purchase an annuity for a participant who retires. The [Trustee] will then apply for an individual retirement annuity contract, on a form provided by [Executive Life]. The contract will be owned by the participant, and will specify the dates and amounts of payments, and all other terms and conditions of the . . . annuity.

Each contract provided that at the end of the fixed term, Executive Life would pay to the trustee, as owner, the accumulated fund value, calculated on the basis of all premium deposits, less any withdrawals and scheduled payments, plus interest earned at the guaranteed rate and left on deposit with Executive Life.

On April 11, 1991, the commissioner of insurance of the State of California placed Executive Life in conservation, thereby freezing all assets of the company. On December 6, Executive Life was declared insolvent by a California court. At the time that the assets of Executive Life were frozen, 278 Unisys employees residing in Nebraska participated in the Plans and had over $1,061,564 invested in the Executive Life contracts. When Executive Life was placed in conservatorship, all payments and withdrawals under the Executive Life contracts were suspended. In response, the Plans suspended all transactions with respect to that portion of the fixed income fund and the insurance contract fund represented by the Executive Life contracts as of March 31, 1991. The Plans also froze the proportional share of each affected employee's account balance, which was calculated by applying the percentage of the fixed income fund and the insurance contract fund invested in the four Executive Life contracts to each individual employee's account balance in those funds. After these

actions were taken, the affected employees were not permitted to make any deposits or withdrawals from the "frozen" portion of their accounts, and therefore each employee's "frozen account" balance was unchanged when Executive Life was declared insolvent on December 6. Subsequently, each employee has received a quarterly account statement showing separately the balance in his or her regular account and the balance in his or her frozen Executive Life account. Under a rehabilitation plan for Executive Life approved by a California court, the affected Unisys employees have recovered a portion of the amount in their frozen accounts. On behalf of these employees, Unisys submitted a claim to the Association for the unpaid balance and interest. The Association denied the claim.

Unisys then filed this action in the district court for Lancaster County. In its operative amended petition, Unisys sought a declaratory judgment that the Executive Life contracts were annuity contracts covered by the Act and that the Nebraska resident participants were entitled to compensation under the Act for amounts still owed by Executive Life under the contracts. The Association filed an answer denying these allegations and asserting certain affirmative defenses. Each party moved for summary judgment.

The district court granted Unisys' motion for summary judgment and denied that of the Association, concluding that the Executive Life contracts were annuity contracts under the Act and that the Act extended coverage to the Plan participants as the equitable or beneficial owners of the contracts. The court denied Unisys' motion for prejudgment and postjudgment interest. The Association filed this timely appeal, and Unisys cross-appealed.

## ASSIGNMENTS OF ERROR

The Association assigns, restated, that the district court erred in (1) concluding that the Executive Life contracts were annuity contracts covered by the Act and (2) concluding that the Nebraska resident plan participants were equitable or beneficial owners of the contracts and thus covered by the Act.

In its cross-appeal, Unisys assigns that the district court erred in denying its motions for prejudgment and postjudgment interest.

## STANDARD OF REVIEW

Summary judgment is proper when the pleadings and the evidence admitted at the hearing disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. *Hamilton v. Nestor*, 265 Neb. 757, 659 N.W.2d 321 (2003); *Bennett v. Labenz*, 265 Neb. 750, 659 N.W.2d 339 (2003). Summary judgment is proper where the facts are uncontroverted and the moving party is entitled to judgment as a matter of law. *Fontenelle Equip. v. Pattlen Enters.*, 262 Neb. 129, 629 N.W.2d 534 (2001).

Although the denial of a motion for summary judgment, standing alone, is not a final, appealable order, when adverse parties have each moved for summary judgment and the trial court has sustained one of the motions, the reviewing court obtains jurisdiction over both motions and may determine the controversy which is the subject of those motions or make an order specifying the facts which appear without substantial controversy and direct further proceedings as it deems just. *Hogan v. Garden County*, 264 Neb. 115, 646 N.W.2d 257 (2002); *Fontenelle Equip., supra.*

Statutory interpretation presents a question of law. When reviewing questions of law, an appellate court has an obligation to resolve the questions independently of the conclusion reached by the trial court. *State ex rel. City of Alma v. Furnas Cty. Farms*, 266 Neb. 558, 667 N.W.2d 512 (2003); *Longo v. Longo*, 266 Neb. 171, 663 N.W.2d 604 (2003).

## ANALYSIS

We begin with the principle that when asked to interpret a statute, a court must determine and give effect to the purpose and intent of the Legislature as ascertained from the entire language of the statute considered in its plain, ordinary, and popular sense. *Nebraska Life & Health Ins. Guar. Assn. v. Dobias*, 247 Neb. 900, 531 N.W.2d 217 (1995). To determine the legislative intent of a statute, a court generally considers the subject matter of the whole act, as well as the particular topic of the statute containing the questioned language. *Id.* The purpose of the Act as stated in § 44-2701 is to

protect resident policyowners . . . of life insurance policies, health insurance policies, annuity contracts, and supplemental contracts of member insurers, subject to certain limitations, against failure in the performance of contractual obligations due to the impairment or insolvency of the member insurer issuing such policies or contracts and to assist in the detection and prevention of insurer insolvencies.

The Act is to be liberally construed "to effect the purposes enumerated in section 44-2701 which shall constitute an aid and guide to interpretation." § 44-2704. See *Dobias, supra.*

The parties admitted in their pleadings that Executive Life is a foreign insurer which became insolvent in 1991. The Act, as it was written during the relevant time period, provides that in this circumstance, the Association shall, subject to the approval of the director:

(a) Guarantee, assume, or reinsure, or cause to be guaranteed, assumed, or reinsured, the covered policies of residents;

(b) Assure payment of the contractual obligations of the insolvent insurer to residents, including obligations to resident certificate holders of group insurance policies or contracts regardless of the domicile of the group policy or contract holders; and

(c) Provide such money, pledges, notes, guarantees, or other means as are reasonably necessary to discharge such duties . . . .

§ 44-2707(4). This obligation is limited by the provision that it "shall not apply to the extent that guaranty protection is provided to residents of this state by the laws of the domiciliary state or jurisdiction of the insolvent insurer other than this state." *Id.* The funds required to carry out the Association's obligations under the Act are obtained by assessments levied against member insurers. See § 44-2708.

The version of the Act applicable to this case defines "[c]overed policy" to mean "any policy or contract or portion of such policy or contract which is not subject to assessment and for which coverage is provided under section 44-2703." § 44-2702(5). Section 44-2703 provides that the Act "shall apply to all direct life insurance policies, health insurance policies,

annuity contracts, supplemental contracts, and certificates under group policies or contracts issued anywhere by a member insurer." A "[m]ember insurer" is defined as "any person authorized to transact in this state any kind of insurance provided for under section 44-2703." § 44-2702(8). The Association admits in its brief that Executive Life was "an insurance company organized under the laws of California and licensed to transact business in Nebraska." Brief for appellant at 10.

The two issues presented in the Association's appeal are (1) whether the Executive Life contracts were "annuity contracts" covered by the Act and (2) if so, whether the Nebraska resident participants in the Plans had an interest in the contracts which would entitle them to compensation under the Act.

### ANNUITY CONTRACTS

We are not the first court to consider the question of whether contracts similar to or identical to those before us here are "annuity contracts" within the meaning of a statute guarantying the obligations of an insolvent insurer. Other courts have reached different resolutions of this issue, due in large part to differing statutory definitions of the terms "annuity" and "annuity contract." For example, in *Ariz. Life & Disability v. Honeywell*, 190 Ariz. 84, 945 P.2d 805 (1997), the Supreme Court of Arizona addressed whether contracts issued by Executive Life to the trustee of certain employee retirement plans established by Honeywell were "annuities" as defined by Arizona law so as to qualify for coverage under Arizona's guaranty act. The court employed a test drawn from the "specialized meaning" of the term " 'Annuities' " set forth in Arizona's insurance code. *Ariz. Life & Disability*, 190 Ariz. at 88, 945 P.2d at 809. The code defined " 'Annuities' " as " 'all agreements to make periodic payments, other than contracts defined . . . as "life insurance", where the making or continuance of all or of some of a series of such payments, or the amount of any such payment, is dependent upon the continuance of human life.' " *Id.*, quoting and citing Ariz. Rev. Stat. § 20-254.01 (1990). The court interpreted the contracts as incorporating the terms of the voluntary retirement plan which they funded. The plan expressly required payment in the event of a participating employee's death. The court therefore concluded

that the contracts met the statutory definition of annuity "because the continuation and amount of periodic payments by [Executive Life] of both principal and interest depended upon the lives of [the retirement plan] participants." *Ariz. Life & Disability*, 190 Ariz. at 91, 945 P.2d at 812.

In *Board v. Life & Health Ins.*, 335 Md. 176, 642 A.2d 856 (1994), the court addressed whether two contracts issued by Executive Life as funding mechanisms for a public employees' retirement plan were "annuities" covered by Maryland's guaranty act. That act did not define the term, but a Maryland insurance statute provided:

> " ' "Annuities" means all agreements to make periodical payments where the making or continuance of all or some of a series of such payments, or the amount of any such payment, is dependent upon the continuance of human life . . . . The business of annuities shall be deemed to include additional benefits operating to safeguard the contract from lapse, or to provide a special surrender value, or special benefit, or annuity, in the event of total or permanent disability of the holder. An "annuity contract" is a contract providing for an "annuity" as defined in this section.' "

*Id.* at 182, 642 A.2d at 859, quoting Md. Code. Ann., Insurance, art. 48A, § 65 (Michie 1994). The Maryland court first examined the Executive Life contracts and their relationship to the retirement plan. According to those terms, if a plan participant died, retired, or suffered severe financial hardship due to illness, the trustee could require Executive Life to pay the pro rata share of that participant's account in the plan. In addition, if the participant retired, became seriously ill, or died, and the participant elected an annuity, the trustee could direct Executive Life to issue the annuity upon payment of the appropriate premium. The court found that these provisions made the withdrawal provisions of the contracts " 'life-contingent,' " reasoning:

> [Executive Life] could be called upon, whenever a participant died, to pay its pro rata share of that participant's account in the [employees' retirement plan]. This amount would be the initial value of the share together with interest at the guaranteed rate, compounded daily. The actual return which [Executive Life] might have realized on its

> investment of the premium deposits (*i.e.,* deferrals), as of the times of demands for payments generated by death or illness of participants, could have been below the amount which [Executive Life] had promised to pay to the [trustee]. Thus, [Executive Life's] assumption of the economic risk was life-contingent.

*Board,* 335 Md. at 186, 642 A.2d at 861. After reaching this conclusion, the court determined that the only remaining issue was whether the contracts met the periodic payment element of the statutory definition of annuity. In this respect, the court reasoned that the contracts " 'provid[ed] for' " an annuity because they provided options to obtain individual policies specifying life-contingent periodic payments. *Id.* at 187, 642 A.2d at 861. The court also found that this interpretation was in accord with significant Maryland legislative history on the issue.

Applying different statutory definitional tests, other courts have held that contracts similar to those at issue here are not annuity contracts within the meaning of a guaranty statute. For example, in *Bennet v. Va Life, Acc. & Sickness Ins.,* 251 Va. 382, 385, 468 S.E.2d 910, 912 (1996), the Supreme Court of Virginia addressed whether certain "Guaranteed Interest Contracts" purchased by a retirement plan from InterAmerican Insurance Company of Illinois were " 'annuity contracts' " entitled to coverage under Virginia's guaranty act. The Virginia statutory scheme specifically defined "annuity," see Va. Code Ann. § 38.2-106 (Michie 1999), and then specifically excluded contracts which would otherwise be considered annuity contracts if such contracts were "not issued to and owned by an individual, except to the extent of . . . any annuity benefits guaranteed to an individual by an insurer under such contract or certificate." Va. Code Ann. § 38.2-1700(C)(5) (Michie 1999). Based upon this statutory language, the court concluded that because the contracts were issued to a trustee, and not to the individual plan participants, they could not be both " 'issued to' " and " 'owned by' " an individual under § 38.2-1700(C)(5). *Bennet,* 251 Va. at 386, 468 S.E.2d at 913. In addition, the court concluded that the "exception" to § 38.2-1700(C)(5) could not be met because an "annuity" was an agreement " 'to make periodic payments in fixed dollar amounts pursuant to the terms of a contract for a

stated period of time or for the life of the person or persons specified in the contract.'" *Bennet,* 251 Va. at 387-88, 468 S.E.2d at 913, quoting § 38.2-106.

Similarly, in *South Carolina Ins. v. Liberty Ins.,* 344 S.C. 436, 545 S.E.2d 270 (2001), the court addressed whether certain agreements entered into between an insurance company and various trustees of privately funded employee retirement plans were "annuity contracts" under South Carolina's guaranty act. The act itself did not define the term, but the South Carolina insurance code defined "annuity" as "every contract or agreement to make periodic payments, whether in fixed or variable dollar amounts, or both, at specified intervals." S.C. Code Ann. § 38-1-20(6) (West Cum. Supp. 2000). Applying this definition, the court concluded that the agreements were not annuities because they did not make periodic payments at specified intervals and only provided the trustees with an option to purchase an annuity. See, also, *Krahling v. First Trust Nat. Ass'n,* 123 N.M. 685, 944 P.2d 914 (N.M. App. 1997) (holding guaranteed investment contracts issued by Executive Life to pension plan not "annuities" under New Mexico's statutory definition of that term because they did not provide periodic payments dependent on continuation of human life).

These cases have no direct application to the issue before us here because neither the applicable version of the Act nor Nebraska's insurance code define the terms "annuity" or "annuity contract." We are instead guided by the following well-established principles. In the absence of anything to the contrary, statutory language is to be given its plain and ordinary meaning. An appellate court will not resort to interpretation to ascertain the meaning of statutory words which are plain, direct, and unambiguous. *Salazar v. Scotts Bluff Cty.,* 266 Neb. 444, 665 N.W.2d 659 (2003); *Hauser v. Nebraska Police Stds. Adv. Council,* 264 Neb. 605, 650 N.W.2d 760 (2002). In addition, a statute is open for construction to determine its meaning only when the language used requires interpretation or may reasonably be considered ambiguous. *City of Omaha v. Kum & Go,* 263 Neb. 724, 642 N.W.2d 154 (2002); *Philpot v. Aguglia,* 259 Neb. 573, 611 N.W.2d 93 (2000). A statute is ambiguous when the language used cannot be adequately understood either from the

plain meaning of the statute or when considered in pari materia with any related statutes. *Johnson v. Kenney*, 265 Neb. 47, 654 N.W.2d 191 (2002); *Premium Farms v. County of Holt*, 263 Neb. 415, 640 N.W.2d 633 (2002).

The Commonwealth Court of Pennsylvania, considering the precise issue before us in this case, noted common-law authority which defined "'annuity'" as a

> "'term somewhat loosely used in financial and legal nomenclature and is perhaps incapable of exact definition. Generally speaking, it designates a right-bequeathed, donated or purchased-to receive fixed periodical payments, either for life or a number of years. Its determining characteristic is that the annuitant has an interest only in the payments themselves and not in any principal fund or source from which they may be derived.'"

*Unisys Corp. v. Pa. Life & Health Ins. Guar.*, 667 A.2d 1199, 1202 (Pa. Commw. 1995), quoting *Dwight Estate*, 389 Pa. 520, 134 A.2d 45 (1957), quoting *Commonwealth, Appellant, v. Beisel*, 338 Pa. 519, 13 A.2d 419 (1940). Black's Law Dictionary defines the term "annuity" alternatively as follows:

> **1.** An obligation to pay a stated sum, usu[ally] monthly or annually, to a stated recipient. • These payments terminate upon the death of the designated beneficiary. **2.** A fixed sum of money payable periodically. **3.** A right, often acquired under a life-insurance contract, to receive fixed payments periodically for a specified duration. Cf. PENSION. **4.** A savings account with an insurance company or investment company, usu[ally] established for retirement income. • Payments into the account accumulate tax-free, and the account is taxed only when the annuitant withdraws money in retirement.

Black's Law Dictionary 88-89 (7th ed. 1999). While not directly applicable to this case, another Nebraska statute defines "[a]nnuity contract" as a "contract or contracts issued by one or more life insurance companies or designated trusts and purchased by the retirement system in order to provide any of the benefits" specified in a public employee retirement system. Neb. Rev. Stat. § 16-1021(2) (Reissue 1997). Given the breadth of the term "annuity" and the absence of an applicable statutory narrowing

definition, we conclude that the term "annuity contract" as used in the Act is ambiguous and thus open for construction. We are obligated by the Act itself to give it a liberal construction so as "to effect the purposes enumerated in section 44-2701," as set forth above. § 44-2704.

The Executive Life contracts have certain characteristics of annuities. Two of the contracts expressly incorporate application forms identifying the contracts as "Group Annuity Contract[s]." The application forms for the remaining two contracts do not appear in the record, but the substantive provisions of those contracts are similar to those which are designated by their accompanying application forms as group annuity contracts. All four contracts define "[a]nnuitant" as "[t]he individual upon whose life the amount and duration of benefits depends." All of the contracts also provide that the trustee may withdraw the annuity value and purchase an individual annuity for a plan participant. In addition, all four contracts provide a participant with the option to choose from three types of annuity benefit payments. The Commonwealth Court of Pennsylvania relied on these characteristics in concluding that the same Executive Life contracts at issue here were "annuity contracts" within the meaning of Pennsylvania's guaranty statute which, like ours, did not specifically define the term "annuity." See *Pa. Life & Health Ins. Guar., supra.* The district court relied upon this Pennsylvania case in reaching its conclusion that the contracts at issue are "annuity contracts" within the meaning of the Act.

The Association argues that the district court's construction is erroneous because "the presence of an unexercised future annuity option" does not make the contracts " 'annuity contracts' " within the meaning of the Act. Brief for appellant at 16. It argues that the contracts are "at best . . . 'unallocated annuity contracts,' " defined as " 'any annuity contract or group annuity certificate which is not issued to and owned by an individual, except to the extent any annuity benefits are guaranteed to an individual by an insurer under such contract or certificate.' " Brief for appellant at 17-18, quoting *Georgia Life & Health v. Gilman Paper Co.*, 249 Ga. App. 767, 549 S.E.2d 751 (2001). Although the phrase "unallocated annuity contract" does not appear in the version of the Act applicable to this case, the Act was amended in

2001 to specifically provide that it shall not apply to an "unallocated annuity contract," defined as "an annuity contract or group annuity certificate that is not issued to and owned by an individual, except to the extent of any annuity benefits guaranteed to an individual by an insurer under the contract or certificate." 2001 Neb. Laws, L.B. 360, codified at §§ 44-2702(16) and 44-2703(2)(b)(xi) (Cum. Supp. 2002).

In order to ascertain the proper meaning of a statute, reference may be had to later as well as earlier legislation upon the same subject. *Nicholson v. General Cas. Co. of Wis.*, 262 Neb. 879, 636 N.W.2d 372 (2001); *Big John's Billiards v. Balka*, 260 Neb. 702, 619 N.W.2d 444 (2000). By its 2001 amendments to the Act, the Legislature has affirmed that from a definitional standpoint, an "unallocated annuity contract" is a species of the broader phrase "annuity contract." Because the Legislature did not specifically exclude unallocated annuity contracts from the scope of the Act until the 2001 amendment, it is reasonable and logical to conclude that prior thereto, the statutory phrase "annuity contract" included an "unallocated annuity contract." While this is likely an issue of last impression, we conclude that the Executive Life contracts at issue in this case were "annuity contracts" falling within the scope of the Act as it was written at the time that Executive Life became insolvent.

## PARTICIPANTS' INTEREST

As noted, the Act was intended to protect "resident policyowners, insureds, including certificate holders under group insurance policies or contracts, beneficiaries, annuitants, payees, and assignees of life insurance policies, health insurance policies, [and] annuity contracts" against an insurer's failure to meet contractual obligations due to insolvency. § 44-2701. The term "[r]esident" is defined by the Act to mean "any person who resides in this state at the time a member insurer is determined to be an impaired or insolvent insurer and to whom a contractual obligation is owed." § 44-2702(11). The Association contends that because a nonresident corporate trustee was designated as the owner of the Executive Life contracts, the Unisys employees on whose behalf this action was brought have no enforceable claim under the Act. The district court rejected this argument, reasoning

that while the trustee was the legal owner of the contracts, the employees were the beneficial owners and that their residence in Nebraska was determinative on the issue of coverage.

The district court relied in part upon *Unisys Corp. v. Pa. Life & Health Ins. Guar.*, 667 A.2d 1199 (Pa. Commw. 1995). Construing statutory language substantially similar to §§ 44-2701 and 44-2702(11), the Pennsylvania court reasoned that because the trustee, as legal owner of the Executive Life contracts, held the proceeds of the contracts for the exclusive benefit of the resident Unisys employees who were participants under the contracts, the employees were equitable owners of the contracts entitled to the protection of Pennsylvania's guaranty act. The Arizona Supreme Court employed similar reasoning in *Ariz. Life & Disability v. Honeywell*, 190 Ariz. 84, 95, 945 P.2d 805, 816 (1997), interpreting statutory language which provided that Arizona's guaranty act applied to contracts " 'issued to residents of this state.' " The court concluded that although the Executive Life contracts at issue were issued to the nonresident trustee, the Arizona resident participants were the equitable owners of the contracts and that thus the contracts were "issued to" them. *Id.* The court noted that the insurance fund's argument to the contrary would defeat the policy of Arizona's guaranty act "to protect individual participants of annuity contracts, among others, from insurance company insolvency." *Id.* at 96, 945 P.2d at 817.

In arguing that the district court erred in holding that the Unisys employees residing in Nebraska were beneficial owners of the contracts entitled to protection under the Act, the Association relies upon authority from other jurisdictions holding that persons situated similarly to the Unisys employees in this case are not entitled to the protection of state insurance guaranty acts. Some of these cases involve interpretation of statutes which are significantly different from the Act before us here. For example, in *Bennet v. Va Life, Acc. & Sickness Ins.*, 251 Va. 382, 385, 468 S.E.2d 910, 912 (1996), the court addressed statutory language granting coverage only to contracts " 'issued to and owned by an individual.' " The court held that nothing in this express statutory language permitted an interpretation that a mere beneficial or equitable owner could satisfy the statutory requirements. In *Georgia Life & Health v. Gilman Paper Co.*,

249 Ga. App. 767, 771, 549 S.E.2d 751, 755 (2001), the court held that an unallocated annuity contract owned by a nonresident trustee was excluded from coverage under Georgia's guaranty act which extended coverage only " 'to the persons who are the contract holders and who . . . [a]re residents.' " Unlike the guaranty acts in these states, however, the Act in Nebraska does not include language limiting protection to circumstances in which annuity contracts are issued to and owned by an individual, nor does it limit coverage to "contract holders."

Statutes relating to the same subject matter will be construed so as to maintain a sensible and consistent scheme and so that effect is given to every provision. *Reiter v. Wimes*, 263 Neb. 277, 640 N.W.2d 19 (2002); *Becker v. Hobbs*, 256 Neb. 432, 590 N.W.2d 360 (1999). Reading §§ 44-2701 and 44-2702(11) together, we conclude that the Act was intended to protect Nebraska residents who are the beneficiaries of a contractual obligation under an annuity contract issued by an insurer who subsequently becomes insolvent. Although the Executive Life contracts designate the Trustee as the legal owner who is authorized to exercise contractual rights, it is clear that the employee participants whose retirement contributions purchased the contracts are the persons entitled to the benefit of the contractual obligations undertaken by Executive Life. Stated another way, it is the resident employees, not the nonresident trustee, who are injured by the insolvency. We agree with the district court that such employees are entitled to protection under the Act.

### Prejudgment and Postjudgment Interest

In its cross-appeal, Unisys contends that the district court erred in refusing to award it prejudgment and postjudgment interest. The court's refusal was based upon our decision in *Nebraska Life & Health Ins. Guar. Assn. v. Dobias*, 247 Neb. 900, 531 N.W.2d 217 (1995). In that case, the insureds under a health insurance policy obtained a judgment against the insurer in the amount of $31,462.23 for covered expenses, plus additional amounts for interest, costs, and attorney fees, for a total of $55,314.61. Before payment of the judgment, the insurer became insolvent. The insureds then filed a claim with the Association for $55,314.61. The Association paid $31,462.23, representing the amount of the

covered expenses on the insurance policy at issue, but refused to pay the remaining amount of the judgment against the insurer attributable to interest, costs, and attorney fee sums. On appeal, we addressed the extent of the Association's obligation under the Act. We noted that § 44-2707(3)(b) provides that if a health insurer becomes insolvent, the Association is to " '[a]ssure payment of the contractual obligations of the insolvent insurer to residents.' " *Dobias*, 247 Neb. at 903, 531 N.W.2d at 220. We further noted that § 44-2702(4) defines " '[c]ontractual obligation' " as " 'any obligation under a policy or contract or portion of such policy or contract for which coverage is provided under section 44-2703.' " *Dobias*, 247 Neb. at 903, 531 N.W.2d at 220. We found that such language did not make the Association as guarantor the legal successor of the insolvent insurer, but only created statutory liability for the Association. After reviewing case law from other jurisdictions addressing similar situations, we concluded that the statutory language limited the Association's liability for "contractual obligations" of an insolvent insurer to only those obligations of the insurer that arose under the policy, and did not "encompass liability of an insolvent insurer arising under law rather than under the provisions of the policy such insurer issued." *Dobias*, 247 Neb. at 906, 531 N.W.2d at 221. We thus held that the Association was not liable for the interest, costs, and attorney fees.

This case is distinguishable from *Dobias* in that the interest claimed is not that assessed against the insolvent insurer, but, rather, that accruing *after* demand to satisfy the contractual obligations of the insurer was asserted against and denied by the Association. Prejudgment interest in Nebraska is awarded pursuant to Neb. Rev. Stat. § 45-103.02 (Cum. Supp. 2002). That statute allows prejudgment interest to accrue on unliquidated claims if certain preliminary steps are followed. There is no dispute that Unisys complied with these steps in this action. Although Neb. Rev. Stat. § 45-103.04 (Cum. Supp. 2002) provides that prejudgment interest does not accrue in certain actions, including any action arising under Chapter 42 of the Nebraska Revised Statutes or any action involving the State of Nebraska or its political subdivisions, there is no express exemption for organizations such as the Association. Similarly,

postjudgment interest in Nebraska is awarded pursuant to Neb. Rev. Stat. § 45-103.01 (Cum. Supp. 2002). That statute provides that postjudgment interest "shall accrue on decrees and judgments for the payment of money from the date of rendition of judgment until satisfaction of judgment." § 45-103.01. There are no statutory exemptions for this type of interest.

The Association argues that it cannot be held responsible for prejudgment or postjudgment interest because § 44-2707(9) provides that "[t]he contractual obligations of the impaired or insolvent insurer for which the association becomes or may become liable shall be as great as but no greater than the contractual obligations of the impaired or insolvent insurer . . . ." However, this statutory language does not address the question of whether the Association can be liable for interest assessed directly against it, as distinguished from interest assessed in the first instance against the insolvent insurer, as was the case in *Nebraska Life & Health Ins. Guar. Assn. v. Dobias,* 247 Neb. 900, 531 N.W.2d 217 (1995).

Although both parties rely on authority from other jurisdictions, we find it unnecessary because the issue can be resolved under the plain language of applicable Nebraska statutes. As we have noted, the claimed interest was never an obligation of the insolvent insurer, but, rather, accrued after the Association refused a request to satisfy the insurer's contractual obligation. The issue is whether the Association should be treated differently than any other civil litigant with respect to liability for prejudgment and postjudgment interest. We find nothing in the Act or in the applicable statutes governing assessment of interest in a civil action which would warrant such treatment. Accordingly, we conclude that the district court erred in failing to award prejudgment and postjudgment interest to Unisys pursuant to §§ 45-103.01 and 45-103.02.

## CONCLUSION

For the reasons stated above, we conclude that the district court did not err in concluding that the Executive Life contracts were "annuity contracts" within the meaning of the Act and that the Unisys employees residing in Nebraska on whose behalf this action was brought had an interest in such contracts which

entitled them to benefits under the Act. However, we conclude that the district court erred in declining to award prejudgment and postjudgment interest to Unisys under §§ 45-103.01 and 45-103.02. Accordingly, we affirm in part, and in part reverse, and remand for determination and assessment of prejudgment and postjudgment interest.

AFFIRMED IN PART, AND IN PART REVERSED AND
REMANDED FOR FURTHER PROCEEDINGS.

HENDRY, C.J., and WRIGHT, J., not participating.