KIM L. BURKE, AS MOTHER AND NEXT FRIEND OF TROY JOSEPH BURKE, A MINOR, APPELLANT, V. ROBERT M. MCKAY ET AL., APPELLEES.

679 N.W.2d 418

Filed May 21, 2004. No. S-02-1371.

Maren Lynn Chaloupka and Robert Paul Chaloupka, of Chaloupka, Holyoke, Hofmeister, Snyder & Chaloupka, for appellant.

Kimberli D. Dawson and Bruce L. Hart, of Hart, Dawson & Sudbeck, P.C., L.L.O., for appellee The Nebraska High School Rodeo Association.

Robert F. Peterson, of Laughlin, Peterson & Lang, for appellee McKay Rodeo Company.

Curtis D. Ruwe and C.J. Gatz for appellee Robert M. McKay.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

STEPHAN, J.

This is an action filed by Kim L. Burke, as mother and next friend of Troy Joseph Burke (Burke), seeking damages for personal injuries sustained by Burke while competing in a high school rodeo in Madison, Nebraska, on May 26, 2000 (the Madison rodeo). The action was initially brought against rodeo stock contractor McKay Rodeo Company, Inc. (MRC), and Robert M. McKay, its sole shareholder. The Nebraska High School Rodeo Association (NHSRA) was subsequently joined as a defendant. Based upon its determination that Burke had assumed the risk of injury as a matter of law, the district court for Madison County entered summary judgment in favor of all defendants. Burke's mother filed this timely appeal, which we moved to our docket pursuant to our authority to regulate the caseloads of this court and the Nebraska Court of Appeals. See Neb. Rev. Stat. § 24-1106(3) (Reissue 1995).

## FACTS

Burke was born on August 20, 1981, and was 18 years old at the time of the Madison rodeo. A resident of Box Butte County, Nebraska, he grew up riding horses and began competing in rodeos when he was 10 or 11 years old. He began participating in bareback riding when he was approximately 15 years old. Burke estimated that he had competed in 60 to 80 rodeos between his sophomore year in high school and the day of his injury, which occurred a week after his graduation. Although Burke had previously been thrown from rodeo animals and had once dislocated his shoulder when riding a bull, he otherwise suffered only "bruises and bumps" prior to the injury which is the subject of this action. At the time of the Madison rodeo, Burke was the defending high school state champion in the bareback event.

The NHSRA is a nonprofit corporation doing business in the State of Nebraska. Its purpose is to offer high school students the opportunity to learn and compete in the sport of rodeo. The NHSRA sanctions 23 to 25 high school rodeos per year which are sponsored by local rodeo committees. Before sanctioning a high school rodeo, the NHSRA must first review and approve the proposal of the local committee with respect to the date and time of the rodeo, the judges, and the rodeo stock contractor.

The NHSRA sanctioned the Madison rodeo held on May 26, 2000. The rodeo was sponsored by the Northeast Nebraska High School Rodeo Club, which contracted with MRC to provide stock for the rodeo. The contract provided in part: "An event director or arena director may declare a particular animal unsatisfactory. Animals used in a contest shall be closely inspected and objectionable ones eliminated." John Mundorf, the director of NHSRA, testified that a stock contractor for a high school rodeo is expected to provide adequate stock which is safe for the participants in the sense that the animal would "not intentionally bring harm to an individual."

Prior to competing in the Madison rodeo, Burke and his parents signed a document entitled "Minor's Release, Assumption of Risk and Indemnity Agreement." This agreement was effective for 1 year beginning August 1, 1999, and was read and signed by Burke and both of his parents. It provided in relevant part:

[W]e, the undersigned, on behalf of the minor and for ourselves . . . do hereby:

1. RELEASE, DISCHARGE AND COVENANT NOT TO SUE the . . . rodeo association [and] sponsors . . . ( . . . hereinafter collectively referred to as "releasees") from any and all claims and liability arising out of strict liability or ordinary negligence of releasees . . . which causes the undersigned injury, death [or] damages . . . .

2. UNDERSTAND that minor's entry into the restricted area and/or participation in rodeo events contains DANGER AND RISK OF INJURY OR DEATH TO MINOR, that . . . rodeo animals are dangerous and unpredictable, and that there is INHERENT DANGER in rodeo which we each appreciate and voluntarily assume because the minor and we choose to do so. Each of the undersigned has observed events of the type that the minor seeks to participate in. . . . WE EACH VOLUNTARILY ELECT TO ACCEPT ALL RISKS connected with the minor's entry into the restricted area and/or participation in any rodeo events.

The entry form for the Madison rodeo was signed by Burke and his father. It stated in part that in consideration for Burke's being able to participate, his parents agreed

to make no claims against the [NHSRA], sponsors of all NHSRA sanctioned activities, or their members or anyone acting through or for them, for any loss or damage, or injury to property, animals, or persons resulting from any cause, including any negligence of any person connected with any of the activities of the rodeo[.]

Signs posted at the Madison rodeo stated the following:

WARNING

Under Nebraska Law, an equine professional is not liable for an injury to or the death of a participant in equine activities resulting from the inherent risks of equine activities, pursuant to this act.

On the day of the Madison rodeo, the draw for the bareback event was posted approximately 2 hours before the competition began. Upon checking the posting, Burke discovered that he had drawn a horse designated as "No. 18." Burke remembered the number and, after looking at the horse, confirmed his belief that

No. 18 was the same horse that he had seen at a May 1999 rodeo in O'Neill, Nebraska (the O'Neill rodeo). At the O'Neill rodeo, Burke had witnessed horse No. 18 go over backward or "flip" onto its rider, injuring him. Burke testified that after observing this, he formed the opinion that horse No. 18 "just went over by himself." Burke testified that he was concerned about riding horse No. 18 in the Madison rodeo because of the incident he had observed at the O'Neill rodeo. Burke talked to another competitor at the Madison rodeo, Beau Saner, and asked him if he had seen horse No. 18 "buck out" at another rodeo. Saner told Burke that he had seen horse No. 18 at another rodeo and that it "bucked straight out" without any trouble and did not go over backward onto its rider. Burke testified that based on his discussion with Saner, he did not have any apprehension about riding horse No. 18.

Burke's father had participated in rodeos and was aware of the potential for injury in rodeo competition. He attended both the O'Neill and the Madison rodeos. Burke's father witnessed horse No. 18 flip over onto its rider at the O'Neill rodeo. Prior to that time, he had never seen a horse flip over onto a rider, and it made an impression on him. He was aware that Burke had drawn horse No. 18 in the Madison rodeo but did not recognize the horse as the same one he had seen flip in O'Neill until the horse was coming into the chute for Burke's ride. When he realized it was the same horse, he was concerned. Burke's father did not, however, say anything to anyone about his concerns until after the chute had opened. He gave Burke advice about how to approach the ride but did not say anything about his concerns regarding the horse or about the possibility of turning the horse out because he felt that it "would be Troy's decision." Three or four minutes elapsed from the time Burke's father recognized horse No. 18 and when the chute opened. He agreed that both he and Burke knew that horse No. 18 was the same horse involved in the incident at the O'Neill rodeo and that they each had an opportunity to stop the ride, but chose not to do so.

Upon leaving the chute with Burke as its rider, horse No. 18 "stood up on his back legs and threw himself to the rear in such a way that he fell over backwards, suddenly crushing [Burke]

between his back and the ground." Burke suffered injuries as a result.

McKay had acquired horse No. 18 in November 1998 for use in bucking events at rodeos. He testified that he bucked the horse twice with a dummy and once with a rider in the spring of 1999 and observed nothing unusual about the animal. McKay testified that the horse was first used in competition at the May 1999 O'Neill rodeo, where it flipped over onto its rider. McKay's son told McKay that he subsequently took horse No. 18 to a rodeo in Wisner, Nebraska, in July 1999 and that it bucked normally without incident. The horse was subsequently injured during that same month and put out to pasture until March 2000. The horse was not ridden between July 1999 and the Madison rodeo in May 2000. McKay testified that he knows more about horse No. 18 than anyone else and that he believed that the horse was reasonably safe or he would not have brought the horse to the Madison rodeo.

Mundorf testified that he had observed the incident involving horse No. 18 at the O'Neill rodeo. He testified that he asked McKay at that time " 'if he had bucked that horse,' " to which McKay replied that he had and also told Mundorf that " 'the horse was fine.' " Mundorf testified that he then asked McKay not to bring the horse to any more high school rodeos. McKay testified that Mundorf made this request after Burke's injury at the Madison rodeo in May 2000, but not before that event.

The operative second amended petition alleges that Burke's injuries were proximately caused by the negligence of NHSRA in "permitting horse #18 to be used in the rodeo when its employees and representatives knew or should have known the horse was unreasonably dangerous to the foreseeable participants," and by the negligence of McKay in "bringing a horse to the competition which he knew or should have known was unreasonably dangerous to the foreseeable participants" and in "bringing horse #18 to the rodeo competition when he had been specifically instructed by Officers of the [NHSRA] not to bring the horse." In their answers, defendants denied the allegations of negligence and asserted affirmative defenses conferred by Neb. Rev. Stat. §§ 25-21,249 through 25-21,253 (Cum. Supp. 2000),

including assumption of risk, release, and immunity. The affirmative defenses were denied by reply.

Each defendant filed a motion for summary judgment. In its order granting the motions, the district court determined from the uncontroverted evidence that Burke was aware of the general danger inherent in rodeo competition and the specific danger of riding horse No. 18 in light of its history of going over backward at the O'Neill rodeo. The court further determined that Burke understood the danger and voluntarily exposed himself to it by choosing to ride horse No. 18, thereby assuming the risk of injury.

## ASSIGNMENT OF ERROR

Burke's mother assigns that the district court erred in granting defendants' motions for summary judgment.

## STANDARD OF REVIEW

Summary judgment is proper when the pleadings and the evidence admitted at the hearing disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. *Unisys Corp. v. Nebraska Life & Health Ins. Guar. Assn.*, 267 Neb. 158, 673 N.W.2d 15 (2004); *Controlled Environ. Constr. v. Key Indus. Refrig.*, 266 Neb. 927, 670 N.W.2d 771 (2003); *Big Crow v. City of Rushville*, 266 Neb. 750, 669 N.W.2d 63 (2003).

In reviewing a summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment is granted and gives such party the benefit of all reasonable inferences deducible from the evidence. *Lalley v. City of Omaha*, 266 Neb. 893, 670 N.W.2d 327 (2003); *Big Crow v. City of Rushville, supra.*

## ANALYSIS

Although the answers assert several alternative affirmative defenses, the district court sustained defendants' motions for summary judgment on the basis of its specific determination that Burke assumed the risk of injury. The defense of assumption of risk is derived from the maxim "volente non fit injuria" which means that "where one, knowing and comprehending the danger,

voluntarily exposes himself to it, although not negligent in so doing, he is deemed to have assumed the risk and is precluded from a recovery for an injury resulting therefrom." *Hollamon v. Eagle Raceway, Inc.*, 187 Neb. 221, 224, 188 N.W.2d 710, 711 (1971), *disapproved on other grounds, Anderson v. Service Merchandise Co.*, 240 Neb. 873, 485 N.W.2d 170 (1992). As currently codified, "assumption of risk" as an affirmative defense means that "(1) the person knew of and understood the specific danger, (2) the person voluntarily exposed himself or herself to the danger, and (3) the person's injury or death or the harm to property occurred as a result of his or her exposure to the danger." Neb. Rev. Stat. § 25-21,185.12 (Reissue 1995). See, also, *Jay v. Moog Automotive*, 264 Neb. 875, 652 N.W.2d 872 (2002); *Pleiss v. Barnes*, 260 Neb. 770, 619 N.W.2d 825 (2000). Where the requisite knowledge, understanding, and voluntary exposure are proved, this court has upheld the application of the defense as a bar to the personal injury claim of a minor. *Schmidt v. Johnson*, 184 Neb. 643, 171 N.W.2d 64 (1969).

The doctrine of assumption of risk applies a subjective standard, geared to the individual plaintiff and his or her actual comprehension and appreciation of the nature of the danger he or she confronts. *Jay v. Moog Automotive, supra*; *Pleiss v. Barnes, supra*. For example, in *Pleiss*, the plaintiff was injured when a ladder on which he was standing flipped, twisted, and started to slide, causing him to fall. The plaintiff testified that he knew that ladders "could 'get shaky and fall'" but that he had never seen a ladder "flip, twist, and slide" prior to his injury. 260 Neb. at 775, 619 N.W.2d at 829. Applying the subjective standard set forth above, we wrote that

> the question is not whether [the plaintiff] knew that in general ladders could be dangerous, but whether he knew and understood that this particular ladder, either because of its placement or because it was not tied down, created a specific danger that it could flip, twist, and slide, causing him to fall.

*Id.* at 776, 619 N.W.2d at 830. We determined that because the record did not indicate any such specific knowledge or understanding, the trial court erred in instructing the jury on assumption of risk.

In applying this subjective standard to the facts in this case, we must first identify the specific danger upon which the defense of assumption of risk is predicated. Viewed in a light most favorable to Burke, the evidence reflects that while a horse ridden in a rodeo bareback competition can be expected to throw its rider by bucking, it is unusual for such a horse to flip over backward and land on top of the rider. Thus, Burke's acknowledged familiarity with the general risks of injury inherent in rodeo competition cannot form the basis of the assumption of risk defense with respect to the injury he sustained at the Madison rodeo. Rather, his conduct must be examined with respect to the specific danger that horse No. 18 would not buck normally, but would instead rear up and flip over backward on top of the rider, causing injury.

Our primary inquiry in this regard is whether Burke knew of and understood the specific danger involved in riding horse No. 18 in the Madison rodeo. The undisputed evidence is that horse No. 18 fell backward onto its rider on only one previous occasion, at the O'Neill rodeo in May 1999. Burke and his father were present and witnessed the incident and were aware of the resulting injury to the rider. Both regarded the actions of horse No. 18 as unusual for a bucking horse. Burke did not observe any physical cause for the horse's actions, testifying that "[i]t appeared to me that he just went over by himself." When Burke drew horse No. 18 at the Madison rodeo, he recognized it as the same horse which had gone over backward onto its rider at the O'Neill rodeo. Likewise, his father recognized the horse before Burke's ride. Thus, there is uncontroverted evidence that Burke and his father knew of and understood the specific risk posed by horse No. 18.

The next inquiry is whether, as a matter of law, Burke voluntarily exposed himself to the danger. The record reflects that the draw for the bareback event in the Madison rodeo was posted approximately 2 hours before the competition began. Both Burke and his father admitted that Burke could have elected not to ride horse No. 18. After discussing the horse with Saner, another competitor, Burke concluded that the behavior of the horse at the O'Neill rodeo was a "one-time deal" and assumed that he could ride the animal, a decision which he subsequently characterized as "a mistake." The record thus establishes that

Burke considered the specific risk posed by riding horse No. 18 and made a conscious decision to expose himself to the potential danger by riding the horse in competition. Moreover, it is uncontroverted that the injuries for which damages are sought in this action occurred as a result of this decision.

There is conflicting testimony with respect to whether Mundorf told McKay not to bring horse No. 18 to any high school rodeo events after the O'Neill rodeo incident. Under our standard of review, which entitles the nonmoving party to the benefit of all favorable inferences, we therefore assume that Mundorf did issue this instruction to McKay. However, we conclude that this does not constitute a genuine issue of material fact with respect to the defense of assumption of risk because Mundorf's statement to McKay was based upon information which was fully known to both Burke and his father, namely, the fact that horse No. 18 fell over backward onto its rider during the O'Neill rodeo. There is nothing in the record to suggest that either Mundorf or McKay had knowledge with respect to the bucking tendencies or propensities of horse No. 18 superior to that of Burke or his father. Cf. *Blose v. Mactier*, 252 Neb. 333, 562 N.W.2d 363 (1997) (superior knowledge of invitor is foundation for liability, absent which no liability exists). Mundorf, McKay, Burke, and Burke's father all witnessed the only prior occasion when the horse fell over backward onto its rider during a rodeo competition. While it is true that Burke's injury could have been avoided if McKay had complied with Mundorf's instruction not to bring the horse to future high school rodeos because of what occurred at the O'Neill rodeo, it is equally true that the injury could have been avoided if, based upon his personal knowledge of the same incident, Burke had elected not to ride the horse in the Madison competition. Burke's deliberate, considered, and voluntary decision to ride the horse with full knowledge of the specific risk of danger based upon the animal's prior actions thus constitutes assumption of risk as a matter of law.

An appellate court is not obligated to engage in an analysis which is not needed to adjudicate the controversy before it. *J.D. Warehouse v. Lutz & Co.*, 263 Neb. 189, 639 N.W.2d 88 (2002). Because we conclude that all claims asserted in this action are

barred as a matter of law by the defense of assumption of risk as set forth in § 25-21,185.12, we do not reach the issues of whether such claims would be barred by the waiver and release agreement executed by Burke and his parents, or under the provisions of §§ 25-21,249 through 25-21,253.

## CONCLUSION

For the foregoing reasons, we conclude that uncontroverted evidence establishes that Burke knew and appreciated the specific danger posed by riding horse No. 18 in the Madison rodeo and that he voluntarily exposed himself to that danger by electing to ride the horse in the rodeo competition. All claims with respect to injuries occurring as a result of such exposure are therefore barred as a matter of law by the doctrine of assumption of risk as codified at § 25-21,185.12, and the district court did not err in entering summary judgment in favor of defendants.

AFFIRMED.

HENDRY, C.J., dissenting.

I respectfully dissent. The doctrine of assumption of risk applies a subjective standard, geared to the individual plaintiff and his or her actual comprehension and appreciation of the nature of the danger he or she confronts. The standard to be applied in determining whether a plaintiff has assumed the risk of injury is a subjective one based upon the particular facts and circumstances of the event. *Jay v. Moog Automotive*, 264 Neb. 875, 652 N.W.2d 872 (2002). Whether the plaintiff assumed a risk usually presents a question of fact. See *id.*

The Restatement (Second) of Torts § 496 D, comment *e.* at 575 (1965), is in accord:

> Whether the plaintiff knows of the existence of the risk, or whether he understands and appreciates its magnitude and its unreasonable character, is a question of fact, usually to be determined by the jury under proper instructions from the court. The court may itself determine the issue only where reasonable men could not differ as to the conclusion.

See, also, *Mandery v. Chronical Broadcasting Co.*, 228 Neb. 391, 399, 423 N.W.2d 115, 120 (1988) ("'[e]xcept where he expressly so agrees, a plaintiff does not assume a risk of harm arising from the defendant's conduct unless he then knows of

the existence of the risk and appreciates its unreasonable character, or the danger involved, including the magnitude thereof, and voluntarily accepts the risk' "); NJI2d Civ. 2.02B (defendant has burden to show that "the plaintiff knew of and understood the *specific* danger" (emphasis supplied)).

As the majority notes, shortly after Burke realized he had drawn horse No. 18 at the Madison rodeo, he talked to Saner, a coparticipant. Saner told Burke that he had observed horse No. 18 at another rodeo and that it had "bucked straight out" without any trouble and did not go over backward onto its rider. This evidence is uncontroverted. Based on Saner's statement, Burke concluded that the O'Neill incident, which occurred approximately 1 year earlier, was a "one-time deal with [the rider in O'Neill] . . . and [the horse] would buck fine." Burke stated that after talking to Saner, he did not have any apprehensions about riding the horse and that he also believed McKay would bring suitable livestock to a high school rodeo.

Viewing this evidence in the light most favorable to Burke, and giving him the benefit of all reasonable inferences as we must do, see *Sherrets, Smith v. MJ Optical, Inc.*, 259 Neb. 424, 610 N.W.2d 413 (2000) (where reasonable minds differ as to whether inference supporting ultimate conclusion can be drawn, summary judgment should not be granted), I am of the view that Burke's conclusion based on Saner's observation creates a genuine issue of fact as to Burke's subjective appreciation and understanding of the specific risk, to wit: that the horse would not buck normally, but would instead rear up and flip over backward. Whether Burke was negligent in reaching that conclusion is not the issue presented by this appeal.

Because I do not believe it is appropriate for Burke's assumption of the risk to be decided as a matter of law, I would reverse the granting of summary judgment on this basis and remand the matter to the district court for further proceedings.

CONNOLLY and GERRARD, JJ., join in this dissent.