MIDWEST NEUROSURGERY, P.C., APPELLANT, V.
STATE FARM INSURANCE COMPANIES, APPELLEE.
DEBBIE LUNDIN, APPELLEE, V.
MIDWEST NEUROSURGERY, P.C., APPELLANT.

673 N.W.2d 228

Filed January 6, 2004. Nos. A-02-559, A-03-076.

Gregory C. Scaglione, Christopher J. Basilevac, and Julie A. Schultz, of Koley Jessen, P.C., L.L.O., for appellant.

David C. Mullin, of Fraser, Stryker, Meusey, Olson, Boyer & Bloch, P.C., for appellee State Farm Insurance Companies.

Joseph B. Muller, of Law Offices of Ronald J. Palagi, P.C., for appellee Debbie Lundin.

HANNON and INBODY, Judges, and BUCKLEY, District Judge, Retired.

HANNON, Judge.

## INTRODUCTION

These consolidated appeals involve a claim by a physicians' group, Midwest Neurosurgery, P.C. (Midwest), to part of the proceeds of a settlement between Debbie Lundin, its patient, and State Farm Insurance Companies (State Farm) for Lundin's tort claim for injuries sustained in an automobile collision with an insured of State Farm. Midwest supplied medical services to Lundin that were billed at $23,193.40, but pursuant to an employee benefit plan, Midwest contractually agreed to accept as full payment for those services only $7,669.17 from Lundin and her employer's medical insurance company combined. State Farm issued a check payable to Lundin and Midwest for $16,410.20. Midwest bases its claim for the full amount of the unpaid portion of its perfected lien under Neb. Rev. Stat. § 52-401 (Reissue 1998). Relying upon Midwest's contractual agreement, Lundin resists. We conclude that the lien under § 52-401 is limited to the amount that Lundin owes Midwest, in this case $885.97, and hence, we affirm the orders of the trial courts which made the same determination.

## BACKGROUND

There is no dispute that Lundin was injured in an automobile accident; that State Farm was the liability insurance carrier for the other driver; that Midwest supplied medical services for which its usual and customary charge was $23,193.40 in treating Lundin's injuries from that accident; that Lundin's health insurance paid $6,783.20 of those charges; that Lundin personally still owes $885.97; that by the employee benefit contract, Lundin owes no more to Midwest; and that Midwest perfected a lien under § 52-401 on any settlement that Lundin might receive in connection with the injuries she sustained.

Lundin settled with the driver of the other vehicle for $50,000, the limit of that driver's liability insurance. State Farm paid most

of the settlement by a separate check to Lundin and her attorney. On June 28, 2001, State Farm issued a check payable jointly to Lundin, her attorney, and Midwest for $16,410.20 to pay the remainder of the settlement. On September 25, Lundin filed case No. A-03-076 against Midwest wherein she sought a declaratory judgment determining that of the $16,410.20, the amount in dispute between her and Midwest, Midwest is entitled to only $885.97 and the balance is hers.

On January 30, 2002, Midwest filed case No. A-02-559, suing State Farm to enforce its lien under § 52-401 and seeking a judgment against State Farm for $16,410.20. (Apparently, Midwest felt that the second action put it in a better position to rely upon its physician lien.) The trial court cited a statement contained in *West Neb. Gen. Hosp. v. Farmers Ins. Exch.*, 239 Neb. 281, 475 N.W.2d 901 (1991), to the effect that the liability of an insurance carrier in the position of State Farm under § 52-401 arises from impairing the physician lien and found that in the instant cases, State Farm had issued a check jointly to Midwest for the amount of the claimed lien and therefore had not impaired Midwest's lien. The court granted State Farm's motion for summary judgment in case No. A-02-559 and dismissed Midwest's petition. We agree that the grant of summary judgment was proper, and we also observe that Midwest's rights under § 52-401 have been fully covered, framed, and litigated in case No. A-03-076.

## SUMMARY OF EVIDENCE

Lundin was an employee of a church, and one of the benefits of her employment was medical insurance. She received these employee benefits through the Christian and Missionary Alliance, and her benefits are spelled out in an "Employee Benefits" booklet. On January 17, 2000, she was injured in an automobile accident and was cared for by a neurosurgeon associated with Midwest.

An affidavit of Midwest's office manager attaches a document which the manager states contains Midwest's contract (hereinafter the Managed Care Agreement) with a firm that makes agreements with doctors to supply medical services to persons entitled to benefits under the Christian and Missionary Alliance benefit plan. The firm's status and names are confusing, but not

its function; therefore, we will simply call the firm Midlands Choice (the name used most frequently for that entity). Midwest supplied the medical services to Lundin under the Managed Care Agreement. That agreement provided in essence that the fees Midwest would receive would be limited to certain prescribed amounts. There is no dispute between the parties on the amount of these limits, and Midwest does not claim that Midlands Choice owes Midwest more money for the services that Midwest supplied to Lundin. There is no dispute that the usual and customary charge for the services Midwest supplied Lundin was $23,193.40, that Midwest received $6,783.20 from Midlands Choice for those services, and that under the Managed Care Agreement and other documents, Midlands Choice does not owe Midwest anything further. Lundin admits that under her plan, she owes $885.97 to Midwest. There is no dispute that Midwest had rendered these services for Lundin under the Christian and Missionary Alliance benefit plan and no dispute that Midwest agrees that if Lundin had no right to recovery from anyone else, it would receive nothing further for its services except the $885.97 Lundin admits she owes. Midwest claims that it can collect more under the provisions of § 52-401.

The Managed Care Agreement provides in significant part in paragraph 3(b):

> The Plan Physician agrees to accept as payment *in full* for providing Covered Services to Plan Patients amounts equal to the Plan Physician's then prevailing charge; however, in the event the Plan Physician's then prevailing charge is for a Covered Service listed on the Plan Physician Fee Schedule, and exceeds the amount computed in accordance therewith, the Plan Physician agrees to accept as payment *in full* the amount computed in accordance with the Plan Physician Fee Schedule. . . . The Plan Physician may bill and collect from the Plan Patient for noncovered services which the Plan Physician provides, but shall not bill or collect from or on behalf of the Plan Patient for any Covered Services in excess of the fee schedule amount established on the Plan Physician Fee Schedule.

(Emphasis supplied.) This provision would clearly limit Midwest to the $885.97 mentioned above unless some other provision of

the Managed Care Agreement or § 52-401 effectively circumvents it. Midwest relied upon its lien under § 52-401 to avoid the effect of this contractual agreement.

Midwest also relied upon a provision of the Managed Care Agreement entitled "Coordination of Benefits." We shall quote that paragraph of the agreement when we consider it in our analysis.

When Lundin first went to Midwest for treatment, she signed a form; the form is too long to quote here, but she agreed therein to assign to Midwest all payments she received for its services; to be responsible for all fees regardless of insurance coverage, including copayments and deductibles; that in the event of multiple coverage benefits, deductibles and copayments shall be coordinated to fill the balance of the account; and to additional provisions which clearly do not effect the issues in this case. We shall call this document the "Registration Sheet" and quote from it in our analysis below.

By agreement of the parties, case No. A-03-076 was tried on affidavits with numerous attached documents. The court issued a written opinion wherein it found that under what we have called the Managed Care Agreement, Lundin owed Midwest $885.97; that the Registration Sheet signed by Lundin upon registration did not change that debt; and that a physician such as Midwest can enforce a lien only to the extent of the amount a doctor can charge a patient. Hence, the court determined that the § 52-401 lien was for only $885.97 and that the balance of $15,524.23 belonged to Lundin and her attorney. Midwest appeals.

## ASSIGNMENTS OF ERROR

The several errors assigned and argued by Midwest in case No. A-03-076, summarized and restated, raise the issues of (1) the amount of Midwest's lien under § 52-401 in view of the Managed Care Agreement under which it supplied the medical services and the form Lundin signed as a patient of Midwest and (2) whether under § 52-401, a physician has a lien for the value of the medical services provided when the patient is not obligated to pay full value. The assignments of error in case No. A-02-559 raise the issue of whether State Farm impaired the lien rights of Midwest.

## STANDARD OF REVIEW

 Summary judgment is proper only when the pleadings, depositions, admissions, stipulations, and affidavits in the record disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. *Agri Affiliates, Inc. v. Bones*, 265 Neb. 798, 660 N.W.2d 168 (2003). In reviewing a summary judgment, an appellate court views the evidence in a light most favorable to the party against whom the judgment is granted and gives such party the benefit of all reasonable inferences deducible from the evidence. *Id.* Case No. A-02-559 was disposed of by the court's granting a motion for summary judgment of dismissal to State Farm. We have concluded above that the trial court correctly granted a summary judgment of dismissal.

Case No. A-03-076 was set for hearing on motions for summary judgment, but upon appearance for that hearing, both sides agreed to submit the case for trial on the affidavits they had prepared for the motion. Many documents were attached to the affidavits. A review of the evidence shows no significant factual dispute.

 Determinations of factual issues in a declaratory judgment action treated as an action at law will not be disturbed on appeal unless they are clearly wrong. *Spanish Oaks v. Hy-Vee*, 265 Neb. 133, 655 N.W.2d 390 (2003). In an appeal from a declaratory judgment, an appellate court, regarding questions of law, has an obligation to reach its conclusion independently of the conclusion reached by the trial court. *Id.*

## ANALYSIS

The outcome of this review requires a determination of the effect of § 52-401 in view of the documents showing the agreement the parties clearly made. That statute provides in significant part:

> Whenever any person employs a physician, nurse, or hospital to perform professional service or services of any nature, in the treatment of or in connection with an injury, and such injured person claims damages from the party causing the injury, such physician, nurse, or hospital, as the

case may be, shall have *a lien upon any sum awarded the injured person in judgment or obtained by settlement or compromise on the amount due for the usual and customary charges* of such physician, nurse, or hospital applicable at the times services are performed . . . .

(Emphasis supplied.) *Id.*

Section 52-401 also provides that a notice of such lien be sent to the person from whom damages are claimed stating "the amount due and the nature of such services," or that a notice be filed in any pending action. It further provides that a physician, nurse, or hospital shall not be liable for attorney fees, but that the lien for the injured person's attorney would have preference. We have not quoted the later provisions of this statute because no issue herein is concerned with those provisions.

In its brief, Midwest admits that it is not entitled to collect any amount in excess of $885.97 from Lundin, but it appeals on the basis that "it is entitled to receive $16,410.20 **from State Farm** in satisfaction of its physician's lien and pursuant to the coordination of benefits language in the Managed Care Agreement and patient registration sheet." Brief for appellant in case No. A-03-076 at 11. In support of that position, Midwest asserts the correct perfection of the lien. We readily agree that Midwest has a perfected lien, but the question is the amount of the lien.

The amount of a lien has not been an issue in many Nebraska cases. In *Alegent Health v. American Family Ins.*, 265 Neb. 312, 656 N.W.2d 906 (2003), the court found that a hospital lien was valid and enforceable even when the underlying debt had been discharged in bankruptcy. That case reports on cases from other jurisdictions where it was held that bankruptcy proceedings do not extinguish physician liens. Interestingly, in the *Alegent Health* case, the insurance company sought to use the holding in *Satsky v. U.S.*, 993 F. Supp. 1027 (S.D. Tex. 1998), a case which we discuss and rely on below, to support its argument that the lien ceased when the debt was forgiven and that the lien hence did not survive the bankruptcy. The Nebraska Supreme Court did not indicate disagreement with the holding of the *Satsky* court, but distinguished it because in *Satsky*, as in this matter, the physician had agreed to accept partial payment as full payment.

In *Parnell v. Good Samaritan Health Sys.*, 260 Neb. 877, 620 N.W.2d 354 (2000), the usual and customary *charge* of the service provider was the amount of the lien, not the amount for which the service provider might supply such services to other patients due to rates frequently given to patients whose care will be paid for by certain payors, such as the government for Medicare, Medicaid, workers' compensation carriers, et cetera. The lower rates are not unlike the ones Midlands Choice negotiated for in Lundin's case. However, necessarily assumed in the decision to offer such a lower rate is the fact that the patient must be liable. Section 52-401 expressly uses the phrases "amount due" and "usual and customary charges."

The situation herein is not uncommon in a society where many businesses, insurance companies, et cetera regularly—if not universally—negotiate with health care providers for a lower rate for those patients the treatment for whom such entities must pay. The question is: If a health care provider agrees to lower the usual rate, specifically agrees to take the lower payment as full payment, and further agrees not to collect the covered amount from the patient, can the health care provider still maintain a lien for the amount forgiven under the agreement with the health care provider?

Other jurisdictions have considered the issue in the case of physician lien statutes similar to § 52-401. In *Satsky v. U.S., supra*, the hospital claimed a lien for medical services. The hospital had agreed to accept the amount negotiated in a health plan as payment in full for services. The court then concluded that the facts failed to show the existence of any debt owed to the hospital because the injured person's health plan insurer had paid all the sums owed to the hospital according to the plan agreed upon by the hospital and the victim's health insurer.

In *N.C. ex rel. L.C. v. A.W. ex rel. R.W.*, 305 Ill. App. 3d 773, 713 N.E.2d 775, 239 Ill. Dec. 244 (1999), the court held that the hospital's lien ceased to exist when the patient's debt to the hospital was paid pursuant to a contract between the hospital and the patient's insurer. The court stated that once the injured person's insurance company had paid the agreed rate, the debt was extinguished.

In *McMeans v. Scripps Health, Inc.*, 100 Cal. App. 4th 507, 123 Cal. Rptr. 2d 143 (2002), *superseded* 58 P.3d 928, 127

Cal. Rptr. 2d 800, the patients brought a class action suit against the hospital for a declaratory judgment that the hospital was not entitled to liens on tort recoveries or uninsured motorist benefits after receiving payment from health insurers. The opinion quotes the applicable statute, which is quite similar to the current Nebraska statute. The *McMeans* court reasoned that the " 'reasonable and necessary charges' " are the amounts charged to the patient or the patient's insurance carrier and that if the agreed charges have been paid, the hospital has no amount, reasonable or otherwise, that it may seek from a third-party tort-feasor. 123 Cal. Rptr. 2d at 151. The court concluded that the hospital's lien rights did not extend beyond the amount it agreed to receive from the class members' medical insurance carriers.

Midwest cites *Stout v. AMCO Ins. Co.*, 645 N.W.2d 108 (Minn. 2002), to support the proposition that courts have held that liability insurance carriers may not claim the benefits lost due to managed care agreements. The *Stout* case involved a claim by an injured party in a no-fault jurisdiction to recover from the insurance carrier the difference between the ordinary fee and the lesser amount the medical provider accepted as full payment for treating the injuries. The basic issue in that case was whether under a no-fault automobile liability act, the decrease in medical benefits due to negotiation between Medicaid and the medical provider should inure to the uninsured motorist liability insurance carrier or to the injured party. The case has nothing to do with the effect of a physician lien statute on such a recovery.

■ We conclude that the lien of a physician, nurse, hospital, or other health care provider under § 52-401 cannot exceed the amount the health care provider agreed to accept for the services rendered to a patient, even if the usual and customary charge for such services is greater than that sum.

In the case at hand, Midwest places some reliance upon paragraph 7 of the Managed Care Agreement, which states:

> Regular coordination of benefits provisions contained in the Contracting Group's health benefits program shall apply to Covered Services provided by the Plan Physician. In the event that the Contracting Group is primary, then the Plan Physician shall be paid in accordance with this Agreement from the Contracting Group, but *nothing herein*

*shall preclude the Plan Physician from seeking or obtaining additional payment from payment sources other than primary.* In the event that the Contracting Group is other than primary, then the Plan Physician shall not be entitled to receive payment from the Contracting Group in excess of the amount which when received from other sources under the applicable coordination of benefits rules equals the amounts computed in accordance with this Agreement.
(Emphasis supplied.)

Midwest supports its position with arguments based on this coordination of benefits provision combined with an argument based on some similar terms used in the Registration Sheet signed by Lundin when she initially sought medical services from Midwest. On the Registration Sheet, after listing personal identification information, Lundin lists Midlands Choice on a line for the "Primary Insurance Carrier," lists nothing on the line for "Secondary Insurance Carrier," and lists State Farm at the top of the second page on a line marked "Auto Insurance Name (If due to an accident)" along with other information arising out of the accident. After listing copayment information, the form has Lundin authorize the release of information to third-party payors, authorize direct payments by any third-party payor to Midwest, and agree to pay copayment liability. The form then provides: "To the extent there is multiple coverage by third party payors such benefits shall be coordinated and the collection of any deductibles, co-insurance or co-payments up to the full amount of the account balance shall be permitted, and I shall remain responsible for the said amount." (The form goes on to provide for interest in certain events.) Midwest maintains that State Farm is an additional source under the coordination of benefits provision and a third-party payor under the Registration Sheet.

When Lundin registered for treatment, she presented the usual health insurance card, which supplied the information necessary for the provider to check on her insurance coverage with Midlands Choice; but the card contained a warning that it did not certify eligibility for benefits and that a preadmission certification was necessary for hospital admission. Midwest argued that the presentation of this card identified Midlands Choice as the primary payment source and that State Farm is hence the secondary

source. A photograph of the card is in evidence, and we can find thereon no indication that it certified Midlands Choice as a primary source; but clearly, Lundin did not identify it as a secondary source on the Registration Sheet. Lundin left blank the space to list a secondary carrier, but she listed State Farm as the automobile insurance carrier. We conclude that Lundin's presentation of the insurance card has no effect on the issues herein.

Midwest maintains that State Farm is an additional source, a secondary source under the coordination of benefits provision, and a third-party payor under the Registration Sheet. Midwest also asserts that these terms had the effect of allowing it to obtain additional payment from State Farm. State Farm is the liability carrier of a tort-feasor who is liable to Lundin. We find no basis for concluding that State Farm is secondarily liable to Midwest, that it is a third-party payor, or that it is an additional source.

■ "Primary insurance coverage is provided when, under the terms of the policy, liability attaches immediately upon the happening of an occurrence that gives rise to liability, as opposed to excess or secondary coverage, which attaches only after a predetermined amount of primary coverage has been exhausted." *Ind. Finishes & Systems v. Amer. Univ. Ins.*, 79 Or. App. 614, 618, 720 P.2d 382, 385 (1986). Under these definitions, both Midlands Choice and State Farm are primary insurers, but Midlands Choice is the primary medical insurance carrier for Lundin and State Farm is the primary liability carrier for the tort-feasor who injured Lundin.

A careful reading of the coordination of benefits provision quoted above establishes only that it refers to "the Contracting Group's health benefits program." The parties do not indicate which program this refers to, but after study of the evidence, we conclude that this provision refers to section J of exhibit 2 in case No. A-03-076, the Christian and Missionary Alliance "Employee Benefits" booklet. That section provides for coordination of benefits, but a careful reading of the section establishes that it coordinates benefits only with other medical insurance such as Medicare, other insurance of the employee or the employee's dependents, or another plan to which Lundin did not subscribe. It gives no indication that an insured's liability coverage would be coordinated with the benefits of the plan to which Lundin did subscribe.

*McMeans v. Scripps Health, Inc.*, 100 Cal. App. 4th 507, 123 Cal. Rptr. 2d 143 (2002), *superseded* 58 P.3d 928, 127 Cal. Rptr. 2d 800, is the only case we found to be on point on this issue. In that case, the hospital made an argument similar to that made here by Midwest. It relied upon the coordination of benefits section of its agreement with the insurer. However, the *McMeans* court held that such provision related to benefits the patient received from other medical insurance, not tort-feasors.

 We conclude that the liability insurance carrier of a tort-feasor who is liable to an injured person who received medical treatment is not a secondary source under a coordination of benefits provision in a contract between the injured person's health care provider and the medical care provider. We also conclude that the listing of a liability insurance carrier by a patient on a registration form signed for a medical care provider does not, without more, make the liability insurance carrier a secondary source; nor does it change any liability of the patient to the medical care provider previously limited by the medical care provider's contract with an employee health benefit provider.

State Farm is a liability insurance carrier. In this situation, State Farm would be liable on the lien only if it settled directly with Lundin and impaired Midwest's lien. In issuing a check payable to both Lundin and Midwest, it did not impair Midwest's lien so as to incur liability under *West Neb. Gen. Hosp. v. Farmers Ins. Exch.*, 239 Neb. 281, 475 N.W.2d 901 (1991). We conclude that State Farm is not liable to Midwest on the lien.

We conclude that Midwest has a lien on the funds due from State Farm for only $885.97 and that the trial court's decree in case No. A-03-076 adequately protects that lien. We likewise conclude that the order of dismissal in case No. A-02-559 was correct. Accordingly, we affirm the trial courts' decisions in both cases.

AFFIRMED.