MIDWEST NEUROSURGERY, P.C., APPELLANT, V.
STATE FARM INSURANCE COMPANIES, APPELLEE.
DEBBIE LUNDIN, APPELLEE, V.
MIDWEST NEUROSURGERY, P.C., APPELLANT.
686 N.W.2d 572

Filed September 17, 2004.   Nos. S-02-559, S-03-076.

643

Gregory C. Scaglione, Christopher J. Basilevac, and Julie A. Schultz, of Koley Jessen, P.C., L.L.O., for appellant.

David C. Mullin, of Fraser, Stryker, Meusey, Olson, Boyer & Bloch, P.C., for appellee State Farm Insurance Companies.

Joseph B. Muller, of Law Offices of Ronald J. Palagi, P.C., for appellee Debbie Lundin.

Edward F. Hoffman, of Cada, Froscheiser, Cada & Hoffman, for amicus curiae Bryan LGH Medical Center.

Lyman L. Larsen and Neil B. Danberg, Jr., of Stinson, Morrison & Hecker, L.L.P., for amicus curiae Nebraska Hospital Association.

HENDRY, C.J., CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

CONNOLLY, J.

In dispute is the amount of a physician's lien that Midwest Neurosurgery, P.C. (Midwest), has on a settlement between Debbie Lundin and Tiffani Monasmith. State Farm Insurance Companies (State Farm) is Monasmith's automobile liability insurer. State Farm, on behalf of Monasmith, and Lundin settled a claim arising out of an automobile collision allegedly caused by Monasmith. Midwest treated Lundin for injuries she sustained in the collision. Midwest's prevailing charge for the services provided to Lundin was $23,193.40. But consistent with the terms of a preexisting agreement with Lundin's health insurer, Midwest agreed to accept $7,669.17 as "payment in full" from Lundin and her health insurer.

The issue is whether Midwest's physician's lien extends to the difference between the prevailing charge and the amount it agreed to accept as "payment in full." The Nebraska Court of Appeals concluded that the lien did not extend to the difference. We agree and affirm.

## I. BACKGROUND

When the collision occurred, Lundin was insured under her employer's health plan, the Christian and Missionary Alliance (C&MA) employee benefit plan. The network administrator for the C&MA plan was Midland's Choice. For our purposes, the

distinction between C&MA and Midland's Choice is not important and to avoid confusion we will refer to them jointly as "C&MA."

Within the health insurance industry, it is common for insurers and medical providers to enter into agreements in which the provider agrees to accept as full payment an amount less than what is billed to the insured patient. In exchange for the provider's agreeing to offer its services at a discounted rate, the insurer agrees to create incentives for its insureds to use the provider, thus helping to ensure a higher volume of patients for the provider. Anne Maltz, Practising Law Inst., Litigation and Administrative Practice Course Handbook Series, Health Insurance 101 (2004).

C&MA and Midwest had entered into such an agreement before Midwest provided medical services to Lundin (Managed Care Agreement). The Managed Care Agreement provided:

> The Plan Physician agrees to accept as payment in full for providing Covered Services to Plan Patients amounts equal to the Plan Physician's then prevailing charge; however, in the event the Plan Physician's then prevailing charge is for a Covered Service listed on the Plan Physician Fee Schedule, and exceeds the amount computed in accordance therewith, the Plan Physician agrees to accept as payment in full the amount computed in accordance with the Plan Physician Fee Schedule.

The "then prevailing charge" for the services Midwest provided to Lundin was $23,193.40. But because this was more than the amount allowed by the "Plan Physician Fee Schedule," Midwest accepted $7,669.17: $6,783.20 from C&MA, and an $885.97 copayment for which Lundin is responsible.

After it treated Lundin, Midwest sent a letter to State Farm in which Midwest claimed that it had a physician's lien under Neb. Rev. Stat. § 52-401 (Reissue 1998).

State Farm, on behalf of Monasmith, later entered into a settlement agreement with Lundin; Midwest did not take part in the settlement negotiations. Under the agreement, Lundin released Monasmith from any liability in exchange for $50,000, the limits under Monasmith's liability policy.

Lundin and Midwest agree that Midwest has a lien on a portion of the settlement proceeds, but they dispute the amount.

Midwest claims that the lien is for $16,410.20, the difference between the "then prevailing charge" and the amount Lundin and C&MA were required to pay after the bill was adjusted in accordance with the Managed Care Agreement. Lundin claims that the lien is for $885.97, the total amount of the copayments she still owes to Midwest.

### 1. LUNDIN'S DECLARATORY JUDGMENT ACTION AGAINST MIDWEST AND MIDWEST'S COUNTERCLAIM

As partial payment of the settlement agreement, State Farm sent a check for $16,410.20 to Lundin's attorneys. The check was made payable to Lundin, her attorneys, and Midwest. After Lundin's attorneys received the check, they tendered $885.97 to Midwest, claiming that the amount was for "full and final payment on her bill." Midwest refused the check from Lundin's attorneys, claiming that it was entitled to the entire $16,410.20.

Lundin then brought a declaratory judgment action against Midwest, seeking a determination that Midwest was entitled to only $885.97 of the settlement funds. Midwest filed a counterclaim seeking a declaration that neither Lundin nor her attorneys had an interest in the State Farm check and ordering them to endorse and deliver the check to Midwest for payment on its perfected physician's lien. Following a bench trial, the court ruled for Lundin and ordered the parties to return the check to State Farm and have State Farm issue two new checks: one made payable to Midwest for $885.97, and one made payable to Lundin and her attorneys for $15,524.23.

### 2. MIDWEST'S ACTION AGAINST STATE FARM

While Lundin's action was pending, Midwest filed an action against State Farm. In the petition, Midwest alleged that State Farm had impaired its lien by settling directly with Lundin; naming Midwest, Lundin, and Lundin's attorneys as payees on the check; and delivering the check to Lundin's attorneys. Both parties moved for summary judgment. The district court granted summary judgment to State Farm, concluding that because State Farm made the check payable to Midwest as well as Lundin and Lundin's attorneys, it had sufficiently protected Midwest's lien.

### 3. Court of Appeals' Decision

The two cases were consolidated for appeal, and the Court of Appeals affirmed both. Regarding Lundin's declaratory judgment action, the court held that under § 52-401, a physician's lien "cannot exceed the amount the health care provider agreed to accept for the services rendered to a patient, even if the usual and customary charge for such services is greater than that sum." *Midwest Neurosurgery v. State Farm Ins. Cos.*, 12 Neb. App. 328, 336, 673 N.W.2d 228, 235 (2004). Regarding Midwest's case against State Farm, the court stated, without analysis, that the grant of summary judgment was proper.

## II. ASSIGNMENTS OF ERROR

Midwest assigns that the Court of Appeals erred in (1) failing to acknowledge Midwest's contractual rights to pursue payment from sources other than the patient and health insurer in accordance with the coordination of benefits language contained in both the Managed Care Agreement and Lundin's patient registration sheet; (2) concluding that a physician's lien against the tortfeasor and liability insurer cannot exceed the amount the physician agreed to accept from the health insurer and patient, thus denying full payment of the medical bills; and (3) failing to acknowledge that State Farm breached its duty to not impair Midwest's physician's lien rights by issuing the settlement check for $16,410.20 to Midwest, Lundin, and Lundin's attorneys.

## III. STANDARD OF REVIEW

In Midwest's case against State Farm, the district court denied Midwest's motion for summary judgment and granted State Farm's motion for summary judgment. In Lundin's declaratory judgment action against Midwest, the court entered judgment for Lundin after a bench trial. In both cases, however, the facts are essentially undisputed. In determining the resolution of these appeals, we focus on the meaning of § 52-401 and the contracts between Lundin and Midwest and Midwest and C&MA.

Interpreting § 52-401 presents a question of law. When reviewing questions of law, an appellate court has an obligation to resolve the questions independently of the conclusion reached

by the trial court. *Unisys Corp. v. Nebraska Life & Health Ins. Guar. Assn.*, 267 Neb. 158, 673 N.W.2d 15 (2004).

■ The interpretation of the Managed Care Agreement involves a question of law, for which this court has an obligation to reach its conclusions independent of the determinations made by the court below. See *Professional Bus. Servs. v. Rosno, ante* p. 99, 680 N.W.2d 176 (2004).

## IV. ANALYSIS

### 1. RESOLUTION OF LUNDIN'S DECLARATORY JUDGMENT ACTION AND MIDWEST'S COUNTERCLAIM

The issue in the declaratory judgment action between Lundin and Midwest centers on the amount of the lien that Midwest had on Lundin's settlement. Lundin seeks a declaration that Midwest is entitled to only $885.97 of the settlement fund. Midwest seeks a declaration that it is entitled to $16,410.20. We begin our analysis with an overview of § 52-401 and then turn to the question of the amount of Midwest's lien.

### (a) Operation of Lien Statute

■ Even in the absence of an express contract, the rendering of medical services creates an implied contract between the provider and the person being given the medical care. *AMISUB v. Allied Prop. & Cas. Ins. Co.*, 6 Neb. App. 696, 576 N.W.2d 493 (1998). Thus, health care providers and their patients stand in a creditor-debtor relationship; but unlike other creditors, the health care providers named in § 52-401 are often called upon to provide their services without first ascertaining whether the patient can pay. See *Bergan Mercy Health Sys. v. Haven*, 260 Neb. 846, 620 N.W.2d 339 (2000). Recognizing that this can create a heavy burden on health care providers, the Legislature passed § 52-401, which provides:

> Whenever any person employs a physician, nurse, or hospital to perform professional service or services of any nature, in the treatment of or in connection with an injury, and such injured person claims damages from the party causing the injury, such physician, nurse, or hospital, as the case may be, shall have a lien upon any sum awarded the injured person in judgment or obtained by settlement or

compromise on the amount due for the usual and customary charges of such physician, nurse, or hospital applicable at the times services are performed, except that no such lien shall be valid against anyone coming under the Nebraska Workers' Compensation Act.

The lien statute ensures that medical care is available to indigent persons by giving health care providers a way of securing compensation for the potentially charitable act of providing care to an indigent party. *Bergan Mercy Health Sys. v. Haven, supra.* Without the lien statute, the provider would be limited to bringing an action against the patient to recover the debt. This creates a problem for the provider: There is the potential that the tort-feasor will pay the judgment and the settlement directly to the patient, who will spend the money without reimbursing the provider. If the patient has no other funds to pay the provider's bill, the action against the patient will be worthless. See *Bergan Mercy Health Sys. v. Haven, supra.*

The lien statute does not change the fact that the patient is still the person responsible for paying his or her bill. But by granting the provider a security interest in the patient's settlement or judgment, it provides a new mechanism for the provider to ensure its bill will be satisfied in whole or in part out of the judgment or settlement. Accord *West Neb. Gen. Hosp. v. Farmers Ins. Exch.*, 239 Neb. 281, 475 N.W.2d 901 (1991) (holding that when injured party receives treatment from provider and then obtains judgment or settlement, lien statute transfers interest of injured party in proceeds of settlement or judgment to provider, up to amount due for usual and customary charges). By perfecting its lien before the tort-feasor pays the judgment or settlement to the patient, the provider creates an obligation on the tort-feasor to ensure that the provider's bill will be satisfied from the funds that the tort-feasor owes to the patient.

In addition, the lien statute creates an incentive for the tort-feasor's insurer to make certain that the provider's bill is paid from the funds owed to the patient. If the insurer impairs the lien, then the insurer is directly liable to the provider for the amount that would have been necessary to satisfy the lien. See, *Alegent Health v. American Family Ins.*, 265 Neb. 312, 656 N.W.2d 906 (2003); *West Neb. Gen. Hosp. v. Farmers Ins. Exch., supra.* With

these principles in mind, we turn to the question of the amount of the physician's lien that Midwest had on Lundin's settlement proceeds.

### (b) Amount of Lien

■ Statutory language is to be given its plain and ordinary meaning; an appellate court will not resort to interpretation to ascertain the meaning of statutory words which are plain, direct, and unambiguous. *Parnell v. Madonna Rehab. Hosp.*, 258 Neb. 125, 602 N.W.2d 461 (1999). The operative language in § 52-401 states that the lien is on "the amount due for the usual and customary charges of such physician, nurse, or hospital."

■ In § 52-401, the phrase "usual and customary charges" acts as a cap; it prevents the lien from being an amount greater than what the provider typically charges other patients for the services that it provided to the injured party. See *Parnell v. Madonna Rehab. Hosp., supra*. The lien however, does not extend to the full amount of the provider's "usual and customary charges." Instead, under the plain language of § 52-401, the lien extends only to the "amount due" for the provider's "usual and customary charges." "Due" means "[o]wing or payable; constituting a debt." Black's Law Dictionary 538 (8th ed. 2004). Thus, under § 52-401, the lien is equal to the debt still owed to the provider for its usual and customary charges.

Of course, how much is still owed to the provider will depend on the facts of each particular case, and so we look to the record to determine the debt still owed to Midwest for the services it provided.

The Managed Care Agreement between C&MA and Midwest provided:

### 3. Responsibilities of Plan Physician.

. . . .

(b) Payment for Covered Services. The Plan Physician agrees to accept as payment in full for providing Covered Services to Plan Patients amounts equal to the Plan Physician's then prevailing charge; however, in the event the Plan Physician's then prevailing charge is for a Covered Service listed on the Plan Physician Fee Schedule, and exceeds the amount computed in accordance therewith, the

> Plan Physician agrees to accept as *payment in full* the amount computed in accordance with the Plan Physician Fee Schedule.

(Emphasis supplied.)

██ When the terms of a contract are clear, a court may not resort to rules of construction, and the terms are to be accorded their plain and ordinary meaning as the ordinary or reasonable person would understand them. *Big River Constr. Co. v. L & H Properties, ante* p. 207, 681 N.W.2d 751 (2004). The language of provision 3(b) is clear. Under it, Midwest agreed to accept as "payment in full" the amount computed under the "Plan Physician Fee Schedule" when that amount was less than Midwest's prevailing charge. The use of the phrase "payment in full" in the Managed Care Agreement contemplates that Midwest will accept the amount computed under the fee schedule as full satisfaction of the debt; once that amount is paid, the debt is extinguished.

Midwest, however, argues that the "payment in full" language in provision 3(b) is qualified by two "coordination of benefits" provisions; one that appears in the Managed Care Agreement and one that appears in a patient registration form that Lundin signed when she was admitted to Midwest. The two provisions contain different language, and we consider them separately.

### (i) Coordination of Benefits in Managed Care Agreement

The coordination of benefits provision in the Managed Care Agreement provides:

> Regular coordination of benefits provisions contained in the Contracting Group's health benefits program shall apply to Covered Services provided by the Plan Physician. In the event that the Contracting Group is primary, then the Plan Physician shall be paid in accordance with this Agreement from the Contracting Group, *but nothing herein shall preclude the Plan Physician from seeking or obtaining additional payment from payment sources other than primary.* In the event that the Contracting Group is other than primary, then the Plan Physician shall not be entitled to receive payment from the Contracting Group in excess of the amount which when received from other sources under

the applicable coordination of benefits rules equals the amounts computed in accordance with this Agreement.

Midwest interprets the italicized language to mean that when there are payment sources other than the medical insurer and the patient, Midwest is not required to accept the amount computed under the fee schedule as payment in full. Instead, according to Midwest, if other payment sources exist, it is owed the difference between its prevailing charge and the amount computed under the fee schedule—but it is limited to recovering the difference from sources other than the patient and C&MA. Midwest, as we understand it, contends that Monasmith and State Farm are payment sources other than C&MA and that thus, the difference between Midwest's prevailing charge and the amount computed under the fee schedule is still part of the debt owed to it—even though it cannot seek to collect the difference from Lundin.

Midwest is correct in its interpretation that when C&MA is primary, the coordination of benefits provision in the Managed Care Agreement preserves Midwest's right to seek additional payment from sources other than primary. But we disagree with Midwest's argument that Monasmith and State Farm are "payment sources other than primary." The Managed Care Agreement does not define "payment sources other than primary." However, the purpose of the Managed Care Agreement is to define the duties running between C&MA and Midwest. Among those duties is C&MA's obligation to pay Midwest directly for the expenses incurred by C&MA's insureds. The phrase "payment sources other than primary" refers to other payment sources that have obligations that mirror C&MA's duty to pay Midwest for the treatment it gave the patient. For example, the situation might arise when the injured party is insured by another health insurer who has its own managed care plan with Midwest. The coordination of benefits provision in the Managed Care Agreement allows Midwest to enforce the other insurer's obligation to pay, even if C&MA has already satisfied its obligation.

But unlike C&MA, neither Monasmith nor State Farm had a duty to pay Midwest for Lundin's treatment. In the settlement agreement, Monasmith promised to pay Lundin in exchange for Lundin's promise to release Monasmith from liability.

Monasmith's duty to pay ran to Lundin, not to Midwest, and thus she cannot be considered under the category of "payment sources other than primary." Likewise, as Monasmith's liability insurer, State Farm had a contractual duty to Monasmith to insure her against her loss. But it had no duty to pay Midwest for the services Midwest provided to Lundin. See *West Neb. Gen. Hosp. v. Farmers Ins. Exch.*, 239 Neb. 281, 475 N.W.2d 901 (1991) (noting that settlement is between tort-feasor and injured party even if insurer pays injured party directly). We reject the argument that under the Managed Care Agreement, Monasmith and State Farm are additional payment sources and that the difference between Midwest's prevailing charge and the amount computed under the fee schedule is part of the amount due to Midwest.

### (ii) Coordination of Benefits Provision in Patient Registration Form

Midwest also relies on a coordination of benefits provision in a patient registration form signed by Lundin. The provision states, "To the extent there is multiple coverage by third party payors such benefits shall be coordinated and the collection of any deductibles, co-insurance or co-payments up to the full amount of the account balance shall be permitted . . . ." Midwest interprets this provision similarly to how it interpreted the coordination of benefits provision in the Managed Care Agreement. Midwest argues that when there is "multiple coverage by third party payors," it is not obligated to accept the amount computed under the fee schedule as payment in full. Instead, the difference between the prevailing charge and the amount computed under the fee schedule is owed to Midwest—but it is limited to recovering the difference from those third-party payors. Midwest argues that it and Lundin agreed that State Farm was a third-party payor that provided coverage and that as a result, the difference was part of the debt owed to Midwest. We disagree.

The coordination of benefits language refers to other third-party payors who provided "coverage" to Lundin. But as the Court of Appeals correctly noted, State Farm did not provide medical coverage to Lundin; it provided liability coverage to Monasmith. Thus, the coordination of benefits clause in the patient registration form is inapplicable.

### (c) Conclusion on Lundin's Declaratory Judgment Action and Midwest's Counterclaim

We reject Midwest's claim that the two coordination of benefits provisions qualified the "payment in full" language in the Managed Care Agreement. Instead, we conclude that Midwest agreed to accept as "payment in full" the amount computed under the fee schedule and cannot use § 52-401 to escape the consequence of the agreements that it struck with C&MA and Lundin. Thus, the Court of Appeals did not err in affirming the district court's conclusion that Midwest's § 52-401 lien did not extend to the difference between the prevailing charge and the amount computed under the fee schedule. We also agree with the Court of Appeals that the district court's order adequately protected the lien.

### 2. RESOLUTION OF MIDWEST'S ACTION AGAINST STATE FARM FOR IMPAIRMENT OF LIEN

In addition to its claims against Lundin, Midwest also alleges that State Farm is liable to it for impairing the lien. According to Midwest, State Farm impaired its lien by not including it in the settlement negotiations and by making the settlement check payable to Midwest, Lundin, and Lundin's attorneys.

We need not determine whether State Farm impaired the lien. We have already decided that the amount of the lien is $885.97. Our resolution of Lundin's declaratory judgment action ensures that Midwest will be paid this amount out of the settlement proceeds. It makes no sense to allow Midwest to maintain an action against State Farm for impairment of the lien when we know that the lien will be satisfied.

### V. CONCLUSION

The Court of Appeals did not err in affirming the opinions of the district court.

AFFIRMED.

WRIGHT, J., participating on briefs.